HORACE A. HEINZE *v.* CARL MURPHY

[No. 21, January Term, 1942.]

424

*Decided March 3, 1942.*

The cause was argued before SLOAN, DELAPLAINE, COLLINS, FORSYTHE, and MARBURY, JJ.

*Robert D. Barlett* for the appellant.

*Harry O. Levin* for the appellee.

FORSYTHE, J., delivered the opinion of the Court.

On June 17, 1941, the appellee, Carl Murphy, filed a suit in the Baltimore City Court against the appellant, Horace A. Heinze, a Baltimore City policeman, for assault and battery and for false imprisonment. The case was tried before the court without a jury, and it resulted in a verdict and judgment in favor of the appellee for $1,000. This appeal is from that judgment.

From the evidence the undisputed facts are that on May 2, 1941, the appellee's wife was driving an automobile on Thirty-third Street, in Baltimore City, and had a collision with another automobile driven by Miss Evelyn Faupel. After the collision, and while awaiting the arrival of an officer whom Miss Faupel had called, the appellee arrived at the scene of the accident in his automobile, and before the arrival of the officer, had his wife drive away from the scene in the appellee's automobile, and the appellee drove away his wife's damaged automobile. He did not drive it to his home, but put it in a garage somewhere in the neighborhood.

Miss Faupel remained at the scene of the accident until the officer, the appellant Heinze, arrived. The appellant secured some information concerning the accident from Miss Faupel, but it was not sufficient to enable him to make a complete report, and with Miss Faupel, Heinze went to the home of the appellee to secure further information, which he believed was necessary for his report. When they arrived at the home of the appellee he was not there, but his wife invited the officer and Miss Faupel in, and "was very nice" to them, offering the use of her dining room table so that the officer could write his report. While the appellant was asking routine questions for his report, the appellee came into the room, and with some display of temper, forbade his wife to answer any questions, or to give the officer any information about the accident; and ordered the officer to leave his home, stating he would not permit his wife to answer any questions without the advice of counsel. Heinze and Miss Faupel then left the house, but a few minutes

later Heinze returned and asked the appellee where he had left the damaged automobile. The appellee refused to tell him, or to give any information about it.

The following day, after the appellee had been afforded an opportunity to consult counsel, the appellant returned to the home of the appellee to secure the information he was denied the previous night. He found the appellee working on the lawn, and inquired if he could see the appellee's wife. On being informed she was not at home, Heinze asked several questions, one of them in reference to her age.

From that point the testimony of what took place between the appellant and the appellee is in conflict. The appellee testified: "I am working in the garden and he comes up and he asks me, 'Where is Mrs. Murphy?' I told him, 'She is in town and won't be back until 11 o'clock.' Thereupon he wants to know something about the accident. I told him I wasn't there any more than he was there and he wasn't there and I didn't know anything about the accident except what she had said. Well, he said, 'How old is Mrs. Murphy?' I told him I didn't know and I don't know. That seemed to infuriate him. He said, 'You know, I can put you under arrest for refusing to answer questions.' I said, 'If its coming to that, you better let me go in and call up Mr. Levin. He is at home. I will ask him about it.' He said, 'You can't leave the spot, you are under arrest.' I asked him for what charge. He said, 'For resisting an officer.' I said, 'Let me go and ring the bell anyhow and call my daughter and let her call Mr. Levin.' He said, 'No, you can't ring the bell.' By that time, some of the neighbors came. He had seized me by the arm and when the neighbors came, an elderly lady across the street looking down from her second-story window saw what was going on and she called one or two of the men and they came over and as they approached, the officer released my arm and stepped back. They asked what was the matter."

The appellant testified: "I drove up in the car and I saw Mr. Murphy on the lawn and I walked up to him

and first asked where Mrs. Murphy was. He said, 'I told you I wasn't going to tell you anything about the accident. Besides, Mrs. Murphy isn't here' and he told me— I asked him if he would give me the following information, it was merely a routine matter as to her age, how long she had been driving, and he said it was none of my God-damn business, and I begged him, I said, 'Listen, Mr. Murphy—' and I touched him by the arm and he said, 'Damn it, I resent that.' He was—in other words, I was between him and the house and he was trying to get into the house, he walked that direction and I said, 'You are under arrest.'

"By the court:

"Q. For what? A. For disorderly conduct.

"Q. What was the disorderly conduct? A. I was up on the lawn asking him questions and he told me I was too damn nosey, it was none of my business asking questions.

"Q. That's why you arrested him? A. He was interfering with my police business.

"Q. They are the facts you arrested him on? A. Yes.

"Q. What did you do after you arrested him? A. Mr. Murphy had been cutting the grass and asked could he put the rake and some other garden utensils, could he clean up before he went to the station house and couldn't he check the house, if it was locked. Of course, when I placed him under arrest, we walked up to the door, but I didn't let him go in the house and his daughter, I believe it was, gave him a coat and she left and and he took his garden utensils and put them in the back garage and by the time he tried up the house and put his utensils away—

"Q. Never mind about the utensils. Where did you take him? A. I took him to the Northeast Police Station.

"Q. What happened there? A. I charged him with disorderly conduct.

"Q. What happened to him? A. He was—I left him in charge of the turnkey."

At the station house, according to the testimony of Officer Warms, which is uncontradicted, the appellee was searched and placed in a cell; "he wasn't in there longer than ten minutes at most," when he was released in the custody of his attorney.

The record does not contain the evidence of any witnesses, other than that of the appellee, in support of his case, although the appellee said "an elderly lady across the street looking down from her second-story window saw what was going on and she called one or two men and they came over." The morning after the arrest the appellee was given a hearing, which consumed "two or three minutes," and he was discharged.

In reference to accidents in which automobiles are involved, the statute in this State prescribing the respective duties of motorists and officers is clear and specific. Article 56, Section 198, Code, 1939, provides: "In case of any accident, such as collision with a person, animal or vehicle, the operator of the motor vehicle in such collision must immediately stop and give his name, residence, and the number of his license to operate, and render such assistance as may be reasonable and necessary within his power." Section 210 of the same Article provides: "The several police officers * * * shall make immediate report to the Commissioner of Motor Vehicles, on forms to be provided by him, of all arrests made on charges of violating the motor vehicle laws of this State," etc. A violation of that provision subjects the officer to a fine.

In this case the evidence is undisputed that the appellant, when he approached the appellee on his lawn, was seeking information to enable him to complete the report required of him. That he had a perfect right to do. But his action in arresting the appellee, under the circumstances as detailed in the evidence, and charging him with disorderly conduct, does not seem to have been fully justified. The disorderly conduct attributed to the appellee was, that he refused to give the information sought, and used profane language. There is no evi-

dence that the profane language, if used, was heard by anyone except the appellant, or beyond the appellee's premises. Under those circumstances the charge could not be sustained.

The principal ground of this appeal is that the damages awarded are excessive. The court awarded punitive damages.

The generally accepted rule in reference to punitive damages, when an officer, such as a policeman, is involved, is that: "An officer who acts in good faith in making an arrest is absolved from punitive or exemplary damages, even though he is liable for compensatory damages. However, such damages may be allowed against an officer under circumstances upon which bad faith or malice may be attributed to him in making the arrest." 22 *Am. Jur., False Imp.,* Sec. 133, p. 439; *Bernheimer v Becker,* 102 Md. 250, 62 A. 526, 3 *L. R. A. (N. S.)* 221, 111 *Am. St. Rep.* 356; *Sloan v. Edwards,* 61 Md. 89, 100. But, "exemplary damages are never allowed where the false imprisonment was brought about innocently, in good faith, without malice in fact or in law, by public officers in the belief that they are performing their public duties." 25 *C. J.,* Sec. 179, p. 565. It is also the established rule that punitive damages "may not be allowed when no actual damage has been sustained." 22 *Am. Jur.,* Sec. 132, p. 438. "A judgment on a verdict awarding punitive damages but no actual damages has been held error. However, nominal compensatory damages, in a proper case, will support a verdict for punitive damages." 25 *C. J.,* Sec. 180, p. 566.

The allowance of exemplary damages must be justified by circumstances of aggravation. A wrong motive must accompany the wrongful act, and without proof of malice or some other aggravation, exemplary damages cannot be recovered. *Sedgwick on Damages,* 9th Ed., Vol. 1, Sec. 363. In this State the awarding of exemplary damages has been fully discussed, and the rule settled. In *Philadelphia, B. & W. R. Co. v. Green,* 110 Md. 32, at page 43, 71 A, 986, 989, Judge Burke, in speaking for

this court, quoted at length from *Philadelphia, W. & B. R. R. Co. v. Hoeflich,* 62 Md. 300, 307, 50 *Am. Rep.* 223, as follows: "It appears to be well settled in this State that mere deliberateness and unnecessary force or violence is not the test of punitive damages. This court, in the case of *Philadelphia, W. & B. R. R. Co. v. Hoeflich,* 62 Md. 300, 307, 50 *Am. Rep.* 223, has stated the rule, under which punitive damages may be allowed in cases of this kind. In discussing a prayer substantially like the one we are considering, Judge Robinson said: 'The force and deliberation with which the wrongful act is done are not necessarily the tests by which the question of punitive damages is to be determined. On the contrary, to entitle one to such damages there must be an element of fraud, or malice, or evil intent, or oppression entering into and forming part of the wrongful act. It is such cases as these that exemplary or punitive damages are awarded as a punishment for the evil motive or intent with which the act is done, and as an example, or warning, to others. But where the act, although wrongful in itself, is committed in the honest assertion of a supposed right, or in the discharge of duty, or without any [evil] or bad intention, there is no ground on which such damages can be awarded.' In *Philadelphia, W. & B. R. R. Co. v. Quigley,* 21 How. 202, 214, 16 L. Ed. 73, Mr. Justice Campbell says: "Wherever the injury complained of has been inflicted maliciously or wantonly, and with circumstances of contumely or indignity, the jury are not limited to the escertainment of a single compensation for the wrong committed against the aggrieved person. But the malice spoken of in this rule is not merely the doing of an unlawful or injurious act. The word implies that the act complained of was conceived in a spirit of mischief, or of criminal indifference to civil obligations.' And in the still later case, in the same court, of *Milwaukee (& St. Paul) R. R. Co. v. Arms et al.,* 91 U. S., 489, 493, 23 L. Ed. 374, Mr. Justice Davis said: 'Redress commensurate to such injuries should be afforded. In ascertaining its extent, the jury may consider all the

facts which relate to the wrongful act of the defendant, and its consequences to the plaintiff; but they are not at liberty to go farther, unless it was done wilfully, or was the result of that reckless indifference to the rights of others which is equivalent to an intentional violation of them. * * * The tort is aggravated by the evil motive, and on this rests the rule of exemplary damages.' We might multiply the cases on this subject if necessary, all concurring that exemplary damages are awarded as a punishment for the evil motive or intention with which the unlawful act is done, and as a warning or example to others."

In the above case the prayer under consideration had reference to deliberate and unnecessary violence, but the principle is the same in reference to the terms "maliciously and wantonly" as used in the prayer in the instant case. In this case there was no evidence at all as to the pecuniary circumstances of the appellant or of the appellee. In *Sloan v. Edwards, supra,* it was held in cases of personal wrongs, "the general rule is, if the injury has been inflicted maliciously or wantonly, and with circumstances of contumely and indignity, the jury are not restricted to actual or compensatory damages, but may give in addition thereto, such exemplary or punitive damages as the circumstances of the case will warrant. And, in such cases, the pecuniary circumstances of the defendant are proper to be considered." *Gaither v. Blowers,* 11 Md. 536, 552.

Also, it is settled law that when a party acts in good faith, he cannot be made liable for exemplary damages. *Sedgwick on Damages,* 9th Ed., Vol. 1, Sec. 383a, p. 745; *Western Union Tel. Co. v. Smith,* 64 Ohio St. 106, 59 N. E. 890. Provocation, though it may not be a defense, will prevent the allowance of exemplary damages. *Baltimore & O. R. R. Co. v. Barger,* 80 Md. 23, 30 A. 560, 26 *L. R. A.* 220, 45 *Am. St. Rep.* 319; *Baltimore & O. R. R. Co. v. Strube,* 111 Md. 119, 73 A. 697. The existence of such malice as will justify the infliction of exemplary damages is a question of fact, and it must be

actual, not constructive or implied. *Knickerbocker Ice Co. v. Gardiner Dairy Co.*, 107 Md. 556, 69 A. 405, 16 L. R. A. (N. S.) 746.

In this case there is a total lack of evidence that the arrest was made maliciously or wantonly. There is no evidence that the appellant ever knew the appelle before the night he interfered with the questioning of his wife, or that there ever was any reason for ill will on the part of the appellant toward the appellele. From a careful consideration of the facts, as disclosed by the evidence, it appears that the appellant, when he approached the appellee on his lawn, conducted himself becomingly as an officer of the law endeavoring to do his duty as he understood it to be. There is no intimation, even from the appellee, that the appellant, at first, did anything but ask him a question. It was not, according to the evidence, until after the appellee refused to show an inclination to cooperate in a matter of simple routine, required of the appellant, that anything was said, or done, by the appellant not in keeping with the duties or conduct of an officer of the law. The appellee appears to have been the one whose conduct was not as restrained as might be expected of a man whose "education, training, occupation, and environment stamp him as one of more than the average in mental equipment and attainments."

The attitude of the appellee, from the very beginning of the affair, was not that of the perfect law-abiding citizen. The undisputed evidence establishes facts which indicate a clear intention on the part of the appellee to hinder, rather than to help, the officer in the discharge of an official duty. Regardless of the rights of the other party involved in the accident, and in disregard of the law requiring both parties to remain at the scene of the accident until it was proper to leave, the appellee hurried his wife away, and himself drove away the damaged automobile before the officer arrived. The uncontradicted testimony of Miss Faupel is: "I came back without the officer because I couldn't get hold of him; in other words,

I came back and asked Mrs. Murphy and her friend to wait until the officer came and by that time Mr. Murphy arrived, after a phone call from Mrs. Murphy or the friend, and I asked them to wait until the officer arrived. They said they didn't have to and Mrs. Murphy drove the new car or good one and Mr. Murphy drove the old or wrecked car home, and they disappeared after I asked them several times to wait on account of calling an officer, and by the time Officer Heinze came they were gone. He looked at my data and apparently it wasn't sufficient and he said he must get the rest tonight and that's what brought us to the house."

Later, the appellee ordered the officer to leave his house when he was trying to get routine information, in an orderly manner, and refused to disclose where the damaged automobile had been stored. The appellee's statement that he did not want his wife questioned until he had had an opportunity to consult counsel was acquiesced in by the appellant, who then quietly left the house. Appellee, however, did not consult counsel prior to the return of the appellant on the following afternoon.

It may well be that a person may not be required to answer questions which would be to their disadvantage, but in so declining it is not at all necessary to assume an antagonistic attitude, and thereby invite the same conduct from an officer. The appellee is not entirely free of unbecoming conduct. It is not a trespass for an officer of the law to go upon another's premises in the line of his duty, although his conduct afterward may make it a trespass. The appellee, by his own conduct, was responsible, in some measure, for giving, as the officer thought, cause for his arrest. Under the facts of this case, it does not appear to us that there a sufficient evidence to find that the appellant acted wantonly, or with malice and ill will, and in accordance with the rules as above stated, a case justifying punitive damages has not been established.

A trespass may be committed from a mistaken notion of power, and from an honest motive to accomplish

434

some good end.  But while the law tolerates no abuse of power, yet, in morals and the eye of the law, there is a vast difference between the criminality of a person acting mistakenly, from a worthy motive, and one committing the same act from a wanton and malicious spirit, and with a corrupt and wicked design.  Hence, where damages beyond compensation, to punish the party guilty of a wrongful act, are asked, the evidence must show wanton or malicious motive, and it must be actual and not constructive or implied.  *Sedgwick on Damages*, 9th Ed., Vol. 1, Sec. 364, p. 717; *Knickerbocker Ice Co. v. Gardiner Dairy Co., supra.*

For the reasons above stated we find the damages allowed in this case to be excessive, and under the procedure authorized by the new General Rules of Practice and Procedure, Part Three, III, Rule 9 (c), must modify the judgment as to the award of damages.  The judgment shall be for $25 damages.

*Judgment in favor of the appellee against
the appellant for $25 damages.  Costs
to be paid by the appellant.*