THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC. *v.* PAUL

[No. 205, September Term, 1969.]

*Decided February 6, 1970.*

644

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*Martin H. Freeman,* with whom were *Sasscer, Clagett, Powers & Channing* on the brief, for appellant.

*Arthur Dale Leach,* with whom were *Paulson, Leach & Wilkinson* on the brief, for appellee.

DIGGES, J., delivered the opinion of the Court.

This case comes before us on appeal from an action for assault and battery, slander and false imprisonment. It involves as appellant The Great Atlantic and Pacific Tea Co., Inc., the owner of the nationally known chain of A & P food stores, and as appellee John Joseph Paul, a retired police officer suffering from a recent heart condition. On the charge that one of A & P's employees, John Parker, falsely accused the appellee of shoplifting, frisked him, and unlawfully detained him, Paul recovered $10,-000 compensatory and $30,000 punitive damages.

Still in a convalescent stage Mr. Paul, in civilian garb, went shopping at his local A & P store in Hillcrest Heights, Maryland, on December 20, 1967. So recent had been his heart attack that this was one of the first times he had ventured out in his automobile. The Hillcrest Heights store was a typical supermarket with check-out counters in the front, many longitudinal rows of self-service aisles in the rear, and of course the usual fleet of shopping carts for the customers' convenience. There was no requirement that a customer must use a cart. On this occasion, due to heavy crowds in the store, Mr. Paul left his cart at the end of one aisle and slowly proceeded to examine carefully the labels of various articles of food to make sure they complied with his strict post-cardiac diet. Having examined and selected a particular item he would

then return to his cart, deposit the goods and go in search of other merchandise.

Mr. Parker, the second assistant manager, testified that he considered this method of shopping somewhat unusual, and his attention having been attracted, he observed Mr. Paul's shopping techniques for approximately twenty minutes. Although Mr. Paul was a regular shopper at this A & P and known to a number of employees there, Mr. Parker, a relatively new addition to the store, did not know him. Upon completion of his observation Parker came to the conclusion that Paul had taken a can of flea and tick spray and had placed it in his coat pocket with the apparent intention of shoplifting. The policy of A & P on shoplifting as testified to by the manager of the store in question was to let each employee "use his own judgment" as to what steps should be taken. He further testified that Parker was authorized to do what was done in this case.

The testimony conflicts widely at this point. Parker testified he merely questioned Paul about a can of flea and tick spray that had been in his cart earlier. He did not see Paul secrete this item anywhere, but assumed he had because it was no longer in the cart and in his opinion Paul had not had sufficient time to return the spray to its proper place on the shelf. He said appellee became nervous and defensive, demanding to see the manager. Parker said he never touched Paul, there was no commotion and there were few customers in the store. Paul testified that Parker accosted him in the middle of an aisle and demanded in a loud voice to know what he had done with the spray. When Paul said he did not have such an item Parker replied, "Don't tell me, you goddamn thief. You got it in your coat." Paul further testified that when this occurred some twenty-five to thirty customers in the immediate vicinity of the aisle turned and stared, and continued to watch as Parker roughly frisked him, knocking over a display of cans and loudly repeating his accusation of thievery. His testimony continues that Parker then grabbed him by the arm and forced him to march

to the manager's office at the front of the store, attracting the attention of shoppers waiting at the check-out counters. No flea spray or any other item belonging to A & P was found on Paul's person. Appellee stated as a result of the experience he was severely upset and reached home in his automobile only with difficulty.

There was testimony that word of this incident spread throughout Paul's neighborhood some two miles from the location of the store, although the specific widespread report was to the effect that Paul had been "picked up for shoplifting." Paul had lived in the community approximately ten years and was well known in the area. Some of the A & P employees at the Hillcrest store were close-by neighbors. Paul testified that the incident aggravated his heart condition causing him physical pain and suffering, as well as personal humiliation.

The jury by its verdict chose to believe Paul's version of the occurrence, and appellant realizes this aspect of the case is final. It insists, however, that mistakes of law requiring reversal have been made by the trial judge, one with reference to the slander phase of the action, the other with respect to the false imprisonment phase.

The facts of this case as found by the jury dispose of many of the subtle and troublesome issues that inhabit the law of defamation. Parker's use of the word "thief" clearly imports commission of a crime (larceny) for which appellee would be liable to indictment and punishment by imprisonment. *Fawsett v. Clark*, 48 Md. 494 (1878). This circumstance makes Parker's utterance slanderous per se and obviates the need for proof of special damages. *Pollitt v. Brush-Moore, Etc., Inc.*, 214 Md. 570, 574-76, 136 A. 2d 573 (1957). Also there is no need here for construction or use of innuendo to see if the words can bear the defamatory meaning alleged, *Shockey v. McCauley*, 101 Md. 461, 61 A. 583 (1905), and there is no claim that use of these words was privileged.

Appellant's sole ground for reversal on the decision of slander is that the element of publication was not satis-

fied. "Publication" in the law of defamation is the communication of defamatory matter to a third person or persons. *Gambrill v. Schooley,* 93 Md. 48, 48 A. 730 (1901) ; 33 Am. Jur., *Libel and Slander,* Sec. 90 (1959) ; Newell, *Slander and Libel* (4th ed. 1924) 218. This means that for alleged defamatory words to be actionable they must be seen or heard by some person other than the plaintiff and defendant.[1] There is the further qualification that this third person must understand the meaning of the words, the familiar example being that no publication occurs when a third person hears slanderous words spoken in a foreign language he does not understand. *Gambrill v. Schooley, supra,* 93 Md. at 60.

Appellant proposes that publication in the law of slander is a different and stricter requirement than it is in libel. It says that in order for slander to be published the plaintiff must show that the defendant spoke the defamatory words in the hearing of a third person who personally knew or knew of the plaintiff. It concedes, as it must, that publication to *any* third party is sufficient in libel. *Gambrill v. Schooley, supra; Shutter Bar Co. v. Zimmerman,* 110 Md. 313, 73 A. 19 (1909). It argues that damage to reputation is the gravamen of slander and there can be no actionable tort when defendant does not communicate the defamatory words to someone whose opinion of the plaintiff may reasonably be affected. It further argues the distinction between libel and slander on this point is that written words have a permanent nature and libelous material once distributed may fairly be presumed to reach persons who personally know the plaintiff. We do not think such a distinction exists in law nor do we think there is any requirement in either libel or slander that the publication be to a third person having personal knowledge of the plaintiff.

Appellant supports his argument by reference to two

1. This is true in most jurisdictions; however Scottish civil law authorizes recovery for injury to plaintiff's own feelings and accordingly publication to a third party is not required. 33 Am. Jur., *Libel and Slander,* Sec. 90, n. 8 (1959).

cases, *Bonkowski v. Arlan's Department Store*, 12 Mich. App. 88, 162 N.W.2d 347 (1968) and *Geraghty v. Suburban Trust*, 238 Md. 197, 208 A. 2d 606 (1965). His reliance is misplaced. We think both of these cases are consistent with well settled law.

In *Bonkowski* a husband and wife were stopped by a department store security guard as they were about to enter their car on a shopping center parking lot. The guard accused the wife of taking jewelry from the department store without paying and compelled her to empty her pocketbook. She established that there were other persons in the parking lot at that time. The court found that the forced emptying of her pocketbook in the presence of a uniformed guard could constitute a dramatic pantomime implying that Mrs. Bonkowski was a thief. However, the court found no publication to the husband (for reasons not here pertinent) and no publication of the "slander by act" because Mrs. Bonkowski neither "knew or could identify anyone [else] who had been present." 162 N.W.2d at 353. Publication not having been established the judgment was reversed. We do not believe this decision is correctly interpreted by appellant. A & P seeks nourishment for its argument by reference to these few quoted words when it is apparent in their proper context the court was merely stating that there was no proof that any one present in the parking lot either heard the remarks or observed the incident. Accordingly, the Michigan court said, "Our ruling here does not mean to suggest that requisite publication of slander may never be presumed, as it can be in the case of publication of libel in a newspaper. [Authorities omitted.] But the proofs here do not suffice." 162 N.W.2d at 353.

In *Geraghty v. Suburban Trust, supra,* the plaintiff alleged she was attempting to secure a loan at defendant's bank when defendant's agent said to her, "I doubt very much if this will go through. I think you are just a front for Mr. Prevost." She alleged these words were slanderous per se as tending to injure her in her business. A demurrer was interposed to this declaration which was sus-

tained by the trial court and affirmed by this Court. A & P in citing this case relies again on only a selected portion of the Court's language. A fuller reading of the opinion makes it obvious the Court merely decided that the words alleged to have been spoken were ambiguous and could not support a charge of slander, absent an allegation that they were heard and interpreted by a listener as conveying the alleged defamatory meaning. We quote from that opinion at 202:

> "Another fundamental principle in the law of slander is that the defamatory words must be 'published.' Publication, in the law of slander, means the transmission of ideas and thoughts to the perception of a person, other than the party speaking and the party spoken of. *Gambill v. Schooley*, 93 Md. 48, 60. We have stated above that there was no allegation in appellant's declaration that anyone (other than she and the bank officer) in whose presence the words were spoken knew her, knew what her business was at the bank, knew what the officer was talking about, or gleaned anything of a defamatory nature from the words spoken; and the words spoken, if considered by themselves, could have been interpreted as having a harmless meaning."

The latter portion of the quoted paragraph completely refutes appellant's contention as to the holding in this case.

After a diligent search we have been able to discover no support for appellant's contention either in cases or texts. In S. Bower, *A Code of the Law of Actionable Defamation*, Art. 6 a (2d ed. 1923), the author states: "It is immaterial, in order to constitute publication in law, whether the communication be made to one or more named or known or specific persons, or to the public at large or a class or number of unknown or undesignated persons. The former kind of publication is termed . . . 'particular publication' and the latter 'general publica-

tion.' " Not only must the words be heard by third persons but they must also be understood to refer to the plaintiff. 33 Am. Jur., *Libel and Slander*, Sec. 90 (1959) states the following: "It would seem to follow, also, that from the language used, aided, if necessary, by extrinsic circumstances, the hearer should be able to identify the person defamed." We think that the requirement of publication in slander is met when the person defamed is clearly recognizable as a distinct individual and that this is the sense in which "know" and "identify" are used. As we said in *Shutter Bar Co. v. Zimmerman, supra,* "The authorities agree that in order to maintain an action for libel or slander it must appear that the defamatory words refer to some ascertained or *ascertainable* person, and that person must be the plaintiff." 110 Md. at 318 (emphasis added).

In *Tocker v. Great Atlantic & Pacific Tea Company,* (D.C. Mun. App.) 190 A. 2d 822 (1963) which case significantly was relied on by the Michigan court in *Bonkowski v. Arlan's Department Store, supra,* a store manager stopped a woman as she left the store and accused her of putting back merchandise in the wrong place. She contended that the words and actions of the manager were ambiguous and required submission to a jury to say whether they constituted a slander by implying she was a thief. She also testified there were other people behind her on the sidewalk. The court affirmed a directed verdict for the defendant. Their reasons for doing so are instructive.

> "The absence of the essential element of *publication* is fatal to appellant's claim for recovery of damages for slander. Because the interest protected by the law of defamation is that of reputation in the opinion of others, to render slander actionable it is necessary that the defaming words be communicated to some person other than the one defamed. Appellant makes no showing that the words spoken to her were

overheard by any other person. The burden was upon appellant to prove by a fair preponderance of the evidence the actual publication of the slanderous words. This she failed to do. She was the sole witness to testify on this point. Her only statement on this critical issue was, 'There were other people behind me.' *No testimony was offered that the words of the manager were spoken in a loud, clear tone susceptible of being overheard or that his action attracted any attention or created any disturbance on the sidewalk.* Appellant did not testify how far away the 'other people' were, whether they were standing near or walking away, or whether they gave any appearance of being interested in her conversation with the manager. It is not enough that the words were uttered in the presence of others unless they were in fact overheard, to the damage of the defamed person's reputation and social standing.

"Appellant cites cases in which a presumption of publication was allowed to be raised, but these cases are distinguishable and *involve a person speaking in a loud voice near others* or admissions by the defendant that his remarks were made to some person other than the defamed party." (Emphasis added.) 190 A. 2d at 823-24.

We note in other jurisdictions that where alleged slanderous remarks are made under circumstances such that it is a reasonable inference that third persons present could have overheard the remarks and understood them to refer to the plaintiff, whether there has been publication is at least a jury question. This is true even when the third persons deny hearing the slanderous statement. *Starnes v. St. Joseph Railway, Light, Heat and Power, Co.,* 331 Mo. 44, 52 S.W.2d 852 (1932) ; *Gaudette v. Carter,* 100 R. I. 259, 214 A. 2d 197 (1965) ; *Tobias v. Sumter Telephone Co.,* 166 S. C. 161, 164 S. E. 446 (1932).

*Accord, Walter v. Davidson,* 214 Ga. 187, 104 S.E.2d 113 (1958) (when third person testified he did not hear remarks, evidence was insufficient to take case to jury in absence of rebutting testimony that words were spoken loudly enough for third person to hear). Appellant, had it wished, may have been entitled to have the jury instructed on this point but he made no such request and took no exception to this portion of the trial judge's charge.

In the instant case the jury could find that appellant's agent accosted plaintiff violently in the aisle; falsely accused him loudly and profanely of being a thief; forced him to submit to a frisk with his hands raised in the air, knocking canned goods to the floor; and these actions caused numerous close-by shoppers to turn and stare at him as if they were observing a "three-ring circus." We think it is disingenuous of A & P to claim that no publication took place under these circumstances, especially since the decision in *Tocker v. A & P, supra,* gave it clear warning what the result would be with a factual situation such as we have here. Appellant would have us conclude that even where a slanderer directs his remarks to the plaintiff under such circumstances that third persons nearby hear the words and understand them to refer to the plaintiff there can be no recovery unless the defamed person can show that the incident was overheard and seen by someone personally familiar with him. Such is not the law as we can find it stated by a single authority in this country and we hold it is not the law of Maryland.[2] In fact we find but one authority even discussing this question, which causes us to observe, as Judge Pring of New South Wales observed when the identical point was made in *Robb v. Morrison,* 20 N.S.W. St. Rep. 163, 10 B.R.C. 298 (1920) : "Yet there have been numbers of cases of that kind [slander], and nobody has

2. Although not directly in point Bonner v. Boyd, 3 H. & J. 278, is an early indication of agreement with the result we now reach. Reference to the plaintiff as a horse thief in a crowd assembled at a "public vendue" was held to authorize recovery by the plaintiff.

yet thought of suggesting that, inasmuch as the person who heard the defamatory language did not know at the time who the parties were, there was no publication. On that point, too, I think the defendants must fail." So do we.

## II

Appellant also claims error was committed in the false imprisonment phase of the case. False imprisonment and false arrest are common law torts that apparently differ only in terminology. 32 Am.Jur.2d, *False Imprisonment*, Sec. 1 (1967). The necessary elements of a case for false imprisonment are a deprivation of the liberty of another without his consent and without legal justification. *Safeway Stores Inc. v. Barrack*, 210 Md. 168, 122 A. 2d 457 (1956).

The term legal justification has created some confusion in other courts. *See Roberts v. Hecht Company*, 280 F. Supp. 639 (D. Md. 1968). This confusion arises because of the frequent statement that probable cause is not a defense to an action for false imprisonment but legal justification is. Probable cause, however, may be shown in mitigation of punitive damages. *Clark's Park v. Hranicka*, 246 Md. 178, 227 A. 2d 726 (1967); *Fleisher v. Ensminger*, 140 Md. 604, 118 A. 153 (1922).

Appellant urges that Maryland should adopt the rule expressed in Restatement (Second) of Torts, Sec. 120 A (1965) "One who reasonably believes that another has tortiously taken a chattel upon his premises, or has failed to make due cash payment for a chattel purchased or services rendered there, is privileged, without arresting the other, to detain him on the premises for the time necessary for a reasonable investigation of the facts." Appellant cites several jurisdictions which have adopted this qualified privilege. It offered an instruction substantially embodying the Restatement language at the trial level, and it is refusal to instruct the jury in accordance with this rule that it assigns as error. It urges strenuously that probable cause should be a defense in this limited situation, detailing the growing problem of shoplift-

ing in this country. It states that the modern self-service style of retail selling makes the shopkeeper powerless to protect his goods unless Section 120 A is adopted in substance. Without being facetious we note that shoplifting may be regarded as the price merchants pay for the success of modern merchandising; goods alluringly displayed to stimulate "impulse buying" inevitably also stimulate "impulse taking."

We think the law in Maryland is settled on this point. When the cases speak of legal justification we read this as equivalent to legal authority. In *Dorsey v. Winters*, 143 Md. 399, 122 A. 257 (1923) the jury was instructed that if they found "that defendant deprived the plaintiff of his liberty without probable cause, then the verdict must be for the plaintiff." We held this instruction defective for failure to distinguish between the torts of false imprisonment and malicious prosecution, saying at page 411, "If the prayer was based upon the theory that the detention of the plaintiff was unlawful, it is defective in failing to require the jury to find as a fact essential to recovery that the arrest and imprisonment were without color of legal authority."

Whatever technical distinction there may be between an "arrest" and a "detention" the test whether legal justification existed in a particular case has been judged by the principles applicable to the law of arrest. A shopkeeper under these principles has only the rights of a private person. In Maryland a private person has authority to arrest without a warrant only when a) there is a felony being committed in his presence or when a felony has in fact been committed whether or not in his presence, and the arrester has reasonable ground (probable cause) to believe the person he arrests has committed it; or b) a misdemeanor is being committed in the presence or view of the arrester which amounts to a breach of the peace. Kauffman, *The Law of Arrest in Maryland*, 5 Md. L. Rev. 125, 155 (1941); 49 Op. Atty. Gen. 11 (1964). Breach of the peace signifies disorderly, dangerous conduct disruptive of public peace and it is clear that the usual shop-

lifting incident does not fit within this category. 5 Am.Jur.2d, *Arrest,* Sec. 29 (1962). Since most shoplifters steal inexpensive items, Note 19 Md. L. Rev. 28, 32 (1959), the only crime they are generally guilty of is petit larceny, a misdemeanor. Code (1957, 1967 Repl. Vol.), Art. 27, Sec. 341. Thus a private person has no power to arrest them, and probable cause to believe they committed the crime is in fact not a defense. We are, therefore constrained to disagree with Judge Thomsen's suggestion in *Roberts v. Hecht Company, supra,* that where probable cause is strong enough it may amount to justification. See *Jefferson Dry Goods Co. v. Stoess,* 304 Ky. 73, 199 S.W.2d.994 (1947).

There is a narrow exception to the general rules of arrest stated above. Any property owner, including a storekeeper, has a common law privilege to detain against his will any person he believes has tortiously taken his property. This privilege can be exercised only to prevent theft or to recapture property, and does not extend to detention for the purpose of punishment. This common law right is exercised at the shopkeeper's peril, however, and if the person detained does not unlawfully have any of the arrester's property in his possession, the arrester is liable for false imprisonment. *McCrory Stores v. Satchell,* 148 Md. 279, 286, 129 A. 348 (1925); *Allen v. London & South Western Ry. Co.,* L. R. 6 Q. B. 65 [1870].

The Maryland Legislature in 1961 implicitly recognized the seriousness of shoplifting and the dilemma of merchants under the then existing law, by passing a comprehensive statute, Code (1957), Art. 27, Sec. 551A. As a result of this legislation shoplifting became a statutory as well as a common law crime, but the law retains the felony—misdemeanor distinction based on value of the goods stolen ($100). A key provision of the Act was subsection (c) which substantially embodied the rule of Restatement (Second) of Torts, Sec. 120 A (1965), and provided civil immunity for merchants having probable cause in certain limited situations, including misdemeanors. This subsection we found unconstitutional for ti-

tling defects in *Clark's Park v. Hranicka,* 246 Md. 178, 227 A. 2d 726 (1967). The decision in *Hranicka* left intact the other provisions of 551A but necessarily restored the older rule of law as to civil liability. After this holding the Legislature did not re-enact subsection (c) with proper titling, but after debating the respective rights of merchants and shoppers took no action except to repeal the void subsection altogether by Chapter 197 of the Acts of 1968. In view of this resolution by the Legislature we do not believe we should remake the law in this area, even if we were inclined to do so.[3]

As it now stands in this state arrest or detention without legal authority, with or without probable cause, will render the arresting person liable for such damages "as the jury may consider actual compensation for the unlawful invasion of his [the plaintiff's] rights and the injury to his person and feelings." In addition, if the act was "inflicted maliciously or wantonly,[4] the jury are not restricted to an award of compensatory damages, but [in its discretion] may award . . . such punitive damages as the circumstances of the case may warrant as a punishment for the wrong done and as an example to others." *Dennis v. Baltimore Transit Co.,* 189 Md. 610, 616, 56 A. 2d 813 (1948). If punitive damages are allowable, probable cause for the detention may be shown in mitigation of this stripe of damage as having a bearing on the quality of any malice or wantonness found to exist. *Clark's Park v. Hranicka, supra* at 187; *Safeway Stores Inc. v. Barrack, supra* at 173-74; *Fleisher v. Ensminger, supra* at 620; *Lewin v. Uzuber,* 65 Md. 341, 348-49, 4 A. 285 (1886).

Having stated all the foregoing, we do not think that even if 120 A of Restatement (Second) had been the law

3. There is a suggestion in Note 19 Md. L. Rev. 28, 35 (1959) that granting civil immunity may offend U. S. Constitutional provisions.

4. The question of whether the arrest was motivated by malice or that there exists wantonness is generally a question for the jury. Dennis v. Baltimore Transit Co., supra. For one definition of the term malice and wantonness as used in false imprisonment cases see Dennis, supra, at 616-17.

of Maryland it would have aided appellant in this case. There was sufficient evidence for the jury to find that the manner and method of the detention here was not within the privilege "necessary for a reasonable investigation of the facts." *See* comments to Sec. 120 A, Restatement (Second) of Torts. But the reasonableness of the detention does not become an issue unless it is first shown that the person invoking the privilege "reasonably believes that another has tortiously taken a chattel upon his premises." Parker testified he did not see Paul place any merchandise in his coat and did not check the shelf to see if the "missing" item had been returned, although if he had, these activities would not have necessarily constituted probable cause. He further testified he stopped Paul in an aisle before Paul had given any indication of leaving the store, even though customers could not pay for any item until they reached the check-out counters at the front of the store. In a self-service store we think no probable cause (which, for the purpose of this opinion, we assume is equivalent to "reasonable belief" under 120 A) for detention exists until the suspected person actually attempts to leave without paying, unless he manifests control over the property in such a way that his intention to steal is unequivocal. Construing all of the evidence in a light most favorable to the defendant, there is no showing of probable cause here.

The existence of probable cause is a question to be determined as a matter of law by the court upon a given state of facts, but when the facts are disputed the question may properly be submitted to the jury under adequate instructions. *Safeway Stores Inc. v. Barrack,* 210 Md. 168, 122 A. 2d 457 (1956). This is so whether probable cause is material under the Maryland law in mitigation of damages, or as a defense under the law of some states.

Finding no error committed by the trial judge on either of the grounds urged by the appellant, we will affirm the judgment entered.

> *Judgment affirmed. Costs to*
> *be paid by appellant.*