# MONTGOMERY WARD & CO., INC. *v.* CLISER

[No. 36, September Term, 1972.]

*Decided December 15, 1972.*

*Motion for rehearing filed January 11, 1973; denied February 5, 1973.*

The cause was argued before BARNES, McWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ., and CHARLES E. MOYLAN, JR., Associate Judge of the Court of Special Appeals, specially assigned.

*Arthur V. Butler,* with whom were *Joseph C. Roesser* and *Butler & Roesser* on the brief, for appellant.

*Harold A. Sakayan* for appellee.

LEVINE, J., delivered the opinion of the Court.

This appeal is from separate judgments, entered below against appellant in one case, in the total sum of $15,000, on verdicts returned by a jury for damages arising from claims of false arrest, assault and battery, and slander. For each of the foregoing wrongs, appellee was awarded $500.00 in compensatory damages and $4,500 in punitive damages.

This embroilment originated on the evening of September 2, 1970, when appellee, then 23 years of age and employed in the plumbing trade, entered appellant's store in the Wheaton Plaza Shopping Center located in Montgomery County for the purpose of buying a tool box. The evidence before the jury permitted it to decide that the following events occurred:

Unable to find the particular tool box he wanted, appellee looked at other items in the same department and eventually selected a ratchet adapter, soapstone, test light and chisel for which he paid the cashier, who gave him a receipt. While in this department, he also examined, but did not purchase, a socket kit, which he returned to its place. He then proceeded to the electrical department in search of an adapter, but, unable to find the particular item he had in mind, he left the store. What transpired after appellee emerged from the store

is best revealed by the following excerpts from his testimony:

> "A I walked out towards the car and I got up to the car and I had the window down and I tossed the bag into the seat and then I heard somebody say something behind me and I turned around and here are these two, Murphy and M.D. [Emde] come up to me and tell me to take the stuff out of my pocket and I said to them; I said, 'What are you talking about?'
>
> * * *
>
> "Q After you turned around tell us what you observed?
>
> "A Well, Murphy and M.D. [Emde] come up and told me to take the stuff out of my pocket.
>
> "Q And who are Murphy and M.D. [Emde]?
>
> "A The two security policemen that worked for Montgomery Ward.
>
> "Q What did you do when they told you to take the stuff out of your pocket?
>
> "A I asked him what he was talking about and he said—
>
> * * *
>
> "A . . . the stuff that you took out of the store, and . . .
>
> * * *
>
> "A I told him, 'You're crazy as hell.'
>
> "Q What happened then?
>
> "A So then I told them, I said, 'What I have got is in the bag that I bought,' and I started to open up the car door and I never even got my hand on the car door, because he said, 'No. I will get it,' and I said, 'No. You are not going to get it. You don't have any business in my father's car.'
>
> "Q What happened then?
>
> "A I started to open the car door. They didn't say anymore. I started to open up the car door and one of them threw their hip up against

the door to stop me from getting in the car, and I had my hand in between the door jamb.

\* \* \*

"Q What happened then?

"A One of them threw their hip against the door and then as soon as that happened the one that was standing behind me says, 'Get him,' and the next thing I knew they had both my arms twisted up behind my back, and dragged me back into the, this loading door, and took me back into the offices back there.

\* \* \*

"Q Can you describe for us what you observed with respect to the parking lot area after you arrived at your car and threw the bag of merchandise into the window?

"A Well, there was people coming around, all around the store, you know, walking out to their cars, leaving, just like I was.

"Q How close were these people to you, to the best of your recollection?

"A Well, I don't know for sure, but they was, couldn't have been very far away, because there were cars parked all over around mine.

\* \* \*"

Appellee then testified that after the two store detectives took him into the office, they forced him to empty the contents of his pocket onto a desk. From his pocket, he removed some miscellanea, none of which represented store merchandise. He also stated that he had put nothing in his pocket after arriving at the store. He then testified as follows:

"Q After your pockets were emptied did you have any conversation with the man who was with you in the inner office?

"A Yes. After he didn't find anything then he asked me; I told him I wanted to get out of

here and he stuck his foot up against the door and told me that they wanted to talk to me.

\* \* \*

"Q What happened then?

"A He left his foot up against the door. I grabbed ahold of the knob and pulled on the door and he stepped away, and I went into the other office and the other door was blocked too.

\* \* \*

"Q How many people did you observe?

"A There was about three or four in there.

"Q And how many people were in front of the door?

"A There was two standing in front of the door.

\* \* \*

"Q What happened then when you got to the second office?

"A Well, then I told them to; would they move so I could get out of here and they just kept standing there and said they wanted me to sign a paper, release paper.

"Q What did you tell them?

"A I told them that I wasn't signing nothing, that all I wanted was to get out of here, . . . ."

After denying motions for directed verdict made at the close of plaintiff's case and at the conclusion of all the evidence, respectively, the court submitted the case to the jury which returned the verdicts we have enumerated above.

Four issues are presented for our consideration by this appeal:

(1) The admissibility *vel non* of a prior arrest record;

(2) Whether the court should have directed a verdict for appellant on the basis that, as a matter of law,

there was probable cause for the arrest, thereby barring the claim for false imprisonment; [1]

(3) That the evidence of publication was insufficient to permit the slander charge to be considered by the jury; and

(4) That the jury should not have been allowed to award punitive damages, as in the false arrest and assault and battery claims there was insufficient evidence of wilfulness, malice and wantonness, and the conduct of the store detectives did not constitute slander per se.

## (1)

When the trial commenced, appellant proffered to attack appellee's character—on the basis that it was put in issue by the false imprisonment and slander claims—by introducing an office record showing appellee's arrest in June, 1961, when he was not quite fourteen, for allegedly shoplifting in the same store. The trial court refused to admit the proffered exhibit, ruling that it was barred by Code (1957, 1966 Repl. Vol.) Art. 26, § 83 (e), a section of the juvenile court subtitle, which provides:

> "No adjudication upon the status of any child in the *jurisdiction of the [juvenile] court shall operate to impose any of the civil disabilities* ordinarily imposed by conviction, nor shall any child be deemed a criminal by reason of such adjudication, nor shall such adjudication be deemed a conviction of a crime, nor shall any child be charged with or convicted of a crime in any court, except that in the case when a child 16 years of age or over is charged with an offense which would amount to a felony in the case of an adult, the judge, after full investigation, may

---

1. Appellant argues that the probable cause asserted here would also have been a defense to slander, but we do not agree since want of probable cause is not an element in defamation cases. To be sure, truth as justification is a complete defense, but it was not pleaded here. Rule 342 c 2 (h), Maryland Rules of Procedure.

waive jurisdiction and order such child held for trial under the regular procedure of the court which would have jurisdiction of such offense if committed by an adult; or such other court may exercise the powers conferred upon the juvenile judge in this chapter in conducting and disposing of such case. *The disposition of a child or any evidence given in the court shall not be admissible as evidence against the child in any case or proceeding in any other court . . . ."* (emphasis added)

The gist of appellant's twofold contention on this issue is that although a conviction, and not a mere arrest, may be employed to impeach the *credibility* of a witness or party, here, since appellee placed his *character* in issue by bringing the false arrest and slander claims, specific acts including a *prior arrest* were admissible. Secondly, it maintains that the court erred in excluding the *arrest* record upon the authority of § 83 (e), since that statute is limited in scope to juvenile court *adjudications.* In our view, there are two reasons why Judge Miller correctly excluded the arrest record.

First, we are not persuaded by appellant's argument that § 83 (e) is inapplicable due to the absence of a juvenile delinquency adjudication. The key provisions of § 83 (e), applicable to juvenile proceedings in Montgomery County only, are substantially similar to Art. 26, § 70-21, effective elsewhere in the state, which is part of the subtitle, "Juvenile Causes," enacted as Ch. 432, Laws of 1969. Art. 26, § 70 expressly provides that:

"The purposes of this subtitle are:

\* \* \*

"(2) To remove from children committing delinquent acts the taint of criminality and the consequences of criminal behavior, and to substitute therefor a program of treatment, training, and rehabilitation consistent with the protection of the public interest;

\* \* \*"

Appellant's argument tacitly concedes that if appellee had been found delinquent by the juvenile court, that adjudication would have been barred by § 83 (e). However, the record before us is silent on what happened after the 1961 arrest. This omission demonstrates, we think, the unsoundness of appellant's argument. For it would mean that, if following the earlier arrest, he was "adjudicated," the unfavorable result, more likely to reflect upon his character, would be inadmissible, but the arrest, which connotes something less, could be used against him. On the other hand, if there were no juvenile court proceedings, or if there were such proceedings with a favorable result, then, surely, there could be no legitimate basis for the use of such a record in order to attack appellee's character. At all events, the legislative intent to allow a person who *may* have committed an act of delinquency as a juvenile to truly rehabilitate himself would be distorted by appellant's argument.

We reject appellant's construction as, in our view, it would subvert the manifest intent of the Legislature to protect citizens against public disclosure—at least in civil proceedings—of charges brought against them as juveniles. In this connection, we note that under § 83 (e), the 1961 charge, theft of a $1.95 baseball, could not have been waived by the juvenile court. *Moquin v. State*, 216 Md. 524, 140 A. 2d 914 (1958), heavily relied upon by appellant, is inapposite here, especially since that case involved charges which could be waived to an adult court.

As an additional reason for upholding Judge Miller's exclusion of the arrest record, we note that the episode for which the arrest was made occurred more than ten years before the trial, while appellee was barely 14 years of age. In 29 Am.Jur.2d, *Evidence,* § 348, it is stated:

> "It is generally held that evidence of the character or reputation of a party to a civil or criminal case should relate and be confined to a time *not too remote* from the time of the act in question. Thus, evidence to prove the good character

or reputation of an adult should be confined, at least, to evidence of his character or reputation while an adult, and should not relate to his character or reputation as a youth. No precise time limit can be laid down, however, for the admissibility of evidence of character or reputation, but rather each case must be decided on the basis of its own particular facts. Of necessity much must be left to the discretion of the trial court as to the admissibility of evidence of reputation, objected to on the ground of remoteness." (emphasis added)

This Court has held that the lapse of time following the commission of a crime may be so long that its occurrence would be too remote to affect a witness's credibility, and that, therefore, admissibility *vel non* should be left to the sound discretion of the trial judge. *Cousins v. State,* 230 Md. 2, 185 A. 2d 488 (1962) ; *Burgess v. State,* 161 Md. 162, 155 A. 153 (1931), and *Simond v. State,* 127 Md. 29, 95 A. 1073 (1915). We see no rational basis for applying a different test where the objective is an attack on character rather than credibility, and far less where a mere record of arrest, rather than an actual conviction, is employed under the facts presented here. Finding no abuse of discretion, we refuse to disturb Judge Miller's ruling.

### (2)

In contending that a directed verdict should have been granted on the basis that probable cause was established as a matter of law, appellant argues strenuously that the testimony of Emde, the store detective, showed "clearly, emphatically, and unequivocally, that he did, in fact, see [appellee] remove the socket from its display case, handle it, and proceed to slip the socket into his pocket." What this argument plainly overlooks is that appellee stoutly denied putting the socket in his pocket, claiming instead that he handled it but returned it to its place.

In *Banks v. Montgomery Ward & Co.*, 212 Md. 31, 128 A. 2d 600 (1957), we defined probable cause as a:

". . . reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing that the accused is guilty. (citations omitted) Mere belief, however sincere, is not sufficient. There must be such grounds of belief founded upon actual knowledge of facts as would influence the mind of a reasonable person." 212 Md. at 39.

We regard it as well-settled that the existence of probable cause is a question to be determined as a matter of law by the court upon a given set of facts, but when the facts are disputed, the question may properly be submitted to the jury under adequate instructions. *Great Atl. & Pac. Tea Co. v. Paul*, 256 Md. 643, 658, 261 A. 2d 731 (1970) ; *Banks v. Montgomery Ward & Co., supra,* 212 Md. at 42; *Safeway Stores, Inc. v. Barrack*, 210 Md. 168, 175, 122 A. 2d 457 (1956) ; *Kennedy v. Crouch*, 191 Md. 580, 590, 62 A. 2d 582 (1948). Our inspection of the record reveals that Judge Miller carefully explained this issue to the jury, and we note that appellant took no exception to that portion of the instructions. That the jury chose to believe appellee rather than appellant's store detective is amply demonstrated, we think, by its verdict.

We fail to see, unless appellee's testimony is completely ignored, how it can be said, as a matter of law, that appellant had probable cause, as we have defined it, for appellee's arrest.

Appellant's contention that there was insufficient evidence of publication to take the issue of slander to the jury rests on what it regards as a flaw in appellee's testimony, which, it says, deals a fatal blow to his case in light of *Tocker v. Great Atlantic & Pacific Tea Company*, 190 A. 2d 822 (D.C. App. 1963). The testimony it quotes is as follows:

"Q Can you describe for us what you observed with respect to the parking lot area after you arrived at your car and threw the bag of merchandise into the window?

"A Well, there was people coming around, all around the store, you know, walking out to their cars, leaving, just like I was.

"Q How close were these people to you, to the best of your recollection?

"A Well, I don't know for sure, but they was, couldn't have been very far away, because there were cars parked all over around mine."

Thus, it contends that this testimony fails to establish where third persons on the parking lot may have been in relationship to appellee, and whether they overheard the conversation.

We think appellant's heavy reliance on *Tocker, supra,* is misplaced as we find it distinguishable from the facts of the case at bar. There, a store manager stopped a woman as she left the store and accused her of putting back merchandise in the wrong place. She contended that the words and actions of the manager were ambiguous and required submission to a jury the issue of whether they constituted a slander by implying that she was a thief. She also testified there were other people behind her on the sidewalk. The court affirmed a directed verdict for the defendant, basing its decision on the "absence of the essential element of *publication* . . . . No testimony was offered that the words of the manager were *spoken in a loud, clear tone susceptible of being overheard* or that his action attracted any attention or created any disturbance on the sidewalk." 190 A. 2d at 823-24 (emphasis added).

In *Paul, supra,* where *Tocker* was quoted and likewise distinguished, Judge Digges, speaking for this Court, said:

"We note in other jurisdictions that where alleged slanderous remarks are made under cir-

> cumstances such that it is a reasonable inference that third persons present could have overheard the remarks and understood them to refer to the plaintiff, whether there has been publication is at least a jury question. This is true even when the third persons deny hearing the slanderous statement." 256 Md. at 652.

Furthermore, appellant's contention appears to be bottomed on the notion that a publication could only have occurred if bystanders were shown to have actually overheard accusations by the store detectives. Publication may be conveyed by means of gestures as well. Prosser, *Law of Torts,* 4th Ed., 1971. *See M. & S. Furniture v. DeBartolo Corp.,* 249 Md. 540, 544, 241 A. 2d 126 (1968).

The testimony quoted by appellant does not reflect the entire picture. The jury here could have found, in contrast to the facts in *Tocker,* that the incident occurred on the parking lot about closing time, not far from the store entrance, while many people were walking towards their cars in the immediate vicinity of appellee's automobile. That, in their presence, the store detectives *shouted* to appellee that he should empty his pockets, referring to the "stuff" that he "took out of the store;" that there was a physical altercation highlighted by their efforts to seize the bag lying on the seat; that their attempts at taking him into custody were marked by such utterances as "get him," and culminated in the spectacle of the two store detectives "hustling" him back into the store. The occurrence was not unlike the events depicted in *Paul, supra,* which we there characterized as a " 'three-ring-circus.' "

We think the testimony presented an issue of fact for the jury on whether there was a publication. We observe again that although Judge Miller thoroughly instructed the jury on this precise point, no exceptions thereto were noted by appellant.

### (4)

Lastly, appellant contends that the trial court erred in

permitting the jury to consider an award of punitive damages in this case.

With regard to the assault and battery charge, it argues that its "agents were special police officers commissioned by the State of Maryland who were acting in the line of their duty. It was their function to apprehend persons who had wrongfully appropriated store property." One answer to this argument is that the jury was free to find, as it obviously did, that appellee was assaulted even though he appropriated no store property. In making its contention, appellant relies heavily on *Heinze v. Murphy,* 180 Md. 423, 24 A. 2d 917 (1942), where this Court is quoted as saying:

> "The generally accepted rule in reference to punitive damages, when an officer, such as a policeman, is involved, is that: 'An officer who acts in good faith in making an arrest is absolved from punitive or exemplary damages, even though he is liable for compensatory damages. However, such damages may be allowed against an officer under circumstances upon which *bad faith or malice* may be attributed to him in making the arrest.' " 180 Md. at 429 (emphasis added).

That quotation might also have included the following statement which appears in *Heinze,* quoting from *Sloan v. Edwards,* 61 Md. 89 (1883):

> " '[T]he general rule is, if the injury has been inflicted maliciously *or wantonly, and with circumstances of contumely and indignity,* the jury [is] not restricted to actual or compensatory damages, but may give in addition thereto, such exemplary or punitive damages as the circumstances of the case will warrant.' " 180 Md. at 431 (emphasis added).

Somewhat later, in *Vancherie v. Siperly,* 243 Md. 366, 221 A. 2d 356 (1966), also an assault and battery case,

we said respecting a contention that it was error to submit a question of punitive damages to the jury:

> "[I]t is clear that where personal injuries have been inflicted maliciously *or wantonly,* the jury, in addition to compensatory damages, may award such exemplary or punitive damages as the circumstances of the case warrant. (citations omitted) The argument that there were no grounds for an award of exemplary damages because, as the defendant put it, 'malice is a necessary element in inflicting exemplary damages and no malice was shown in the instant case' overlooks the fact that a finding by the jury that the injury had been *wantonly* inflicted would *also* justify the award of exemplary damages." 243 Md. at 373-74 (emphasis added).

The jury could have found that appellee, though an innocent bystander, was forcefully assaulted in the presence of onlookers on the parking lot by the two store detectives, one of whom weighed 200 pounds; that one deliberately closed the car door on appellee's hand while the other said, "get him." Without establishing that he would not come peacefully, they dragged him, with his arms twisted behind his back, to the security office inside the store. We think that in light of this testimony, the question of punitive damages based on assault and battery was properly a jury question. It could have found, as required by Judge Miller's instructions to so do in order to award punitive damages, that the assault and battery was "wilful, wanton and committed with malice." *Vancherie v. Siperly* and *Heinze v. Murphy,* both *supra.*

What we have said regarding the legal test applicable to the recovery of punitive damages under the assault and battery claim is largely controlling on the false arrest charge. Thus, in *Paul, supra,* we said regarding the false arrest claim there:

> "[I]f the act was 'inflicted maliciously or wan-

tonly, the jury [is] not restricted to an award of compensatory damages, but [in its discretion] may award . . . such punitive damages as the circumstances of the case may warrant as a punishment for the wrong done and as an example to others.' " 256 Md. at 657 (brackets in original).

We likewise noted in *Paul,* citing with approval *Dennis v. Baltimore Transit Co.,* 189 Md. 610, 56 A. 2d 813 (1948), that the question of whether an arrest is motivated by malice or whether there exists wantonness is generally a question for the jury.[2]

In addition to those facts we have recited, there was the additional testimony that, in effect, after having been forced to empty his pockets to establish his innocence, appellee was momentarily prevented from leaving the security office unless he agreed to sign a civil release, to which appellant was neither in fact nor in law entitled. This conduct, not to mention what transpired outside and while appellee was conveyed to the office, justified the submission of that issue to the jury.

It may well be that Code (1957, 1971 Repl. Vol.) Art. 27, § 551A has added a new dimension to the tort of false imprisonment in requiring that want of probable cause be established. Since malice may be implied from want of probable cause, *Banks v. Montgomery Ward & Co., Safeway Stores, Inc. v. Barrack* and *Kennedy v. Crouch,* all *supra,* it would now seem possible to recover punitive damages in a false arrest case without proof of actual malice.

Appellant argues that recovery of punitive damages should not have been allowed on the slander claim, since the words uttered by its agents were not actionable per se in that they did not import the commission of a crime. We think this issue is controlled by *Paul, supra,* and

2. For a statement of what constitutes "wanton conduct" or "wantonness" as a basis for awarding punitive damages, see St. Paul At Chase v. Mfrs. Life Insur., 262 Md. 192, 239, 278 A. 2d 12 (1971).

*American Stores Co. v. Byrd,* 229 Md. 5, 181 A. 2d 333 (1962). In *Paul,* referring to the facts there, we said that:

> "[U]se of the word 'thief' clearly imports the commission of a crime (larceny) for which appellee would be liable to indictment and punishment by imprisonment." 256 Md. at 647.

In *Byrd,* a customer made some purchases and while she waited for her change at the checkout counter, the store manager delivered to the cashier some money which the cashier absentmindedly placed in a drawer of the cash register. After she had been checked out and had emerged from the store, the manager, having been informed by the cashier that she could not find the money, hurried to the customer and " 'hollered' " to her. In a loud and angry tone of voice, in the presence of others, the manager demanded to know whether she had "gotten or picked up" the money that he had placed on the counter. Although she vehemently denied doing so, the manager repeatedly questioned her, and then demanded to inspect her packages. Not finding the money, he asked, somewhat angrily, to examine her pocketbook, which also did not contain the missing amount. At this point he ushered her back into the store with the words: "Come on, let's go . . . . All right, let's go?" We said there:

> "Consistently this Court has held that words which falsely charge a person with or impute to him the commission of a crime for which he is liable to be prosecuted and punished are actionable per se . . . . [I]f spoken words convey an implication of crime, they are actionable in whatever mode their meaning may be expressed, that is, whether by way of interrogation, insinuation, ironic praise or any other form of speech understood by the hearers . . . .
> ". . . But there is no requirement that the defamatory words must embody an outright ac-

cusation of the commission of a crime, for '[i]n cases of slander, words take their actionable character from the sense in which they appear to have been used, and that in which they are most likely to be understood by those who hear them.' (citation omitted) And if the slanderous words used are such as in ordinary 'lay conversation' will impute, or be understood to impute guilt, that is sufficient to make them actionable *per se.* (citations omitted)

"Thus it appears that in some cases, such as this one, it is necessary to look into the accompanying circumstances at the time the alleged defamatory words were spoken in order to determine whether the words are slanderous *per se.*" 229 Md. at 13-14 (bracket in original).

We think that the events which occurred outside the store, measured by the principles enunciated in *Byrd,* were sufficient for the court to have determined that there was an imputation of crime and, therefore, the existence of slander per se.

As appellant suggests, although it should perhaps have been determined as a question of law by the court, it does appear from his instructions that Judge Miller permitted the jury to decide the issue of whether there was slander per se. What we said in *Byrd* is, perhaps, apposite here:

"[W]e agree that ordinarily it is the responsibility of the court, when required to do so, to rule as a matter of law (and not the duty of the jury to find as a fact) whether the words and behavior of a speaker are actionable *per se.*" 229 Md. at 15 (parentheses in original).

We need not decide whether in this case the issue should have been decided by the court as a matter of law, since we have determined that the words and conduct were actionable per se. Hence, that the jury reached that

conclusion as a matter of fact was clearly not prejudicial to appellant.

While it would appear that we have fully considered the various contentions advanced by appellant, there is a further aspect to its complaint regarding punitive damages which we believe has also been preserved for our review and which we therefore reach.

While the trial court charged the jury on the legal requirements which must exist for an award of punitive damages, his instructions did not outline, in any manner, the facts on which such damages could rest. We have carefully studied the record with special regard to the evidence supporting punitive damages, and we are persuaded that in the particular circumstances of this multi-faceted case, appellant was resoundingly punished three times for the same wilful, wanton and malicious conduct.

The testimony leaves no doubt that the complete series of events, beginning with the moment appellee was initially accosted on the parking lot and concluding with his departure from the security office, consumed a short period of time. For example, appellee testified he was in the office only five minutes. Even appellee's brief, in defense of the punitive damage verdicts, refers to the complete series of events collectively as justification for *each* of the awards.

What transpired here is suggestive of a similar issue in *Drug Fair v. Smith*, 263 Md. 341, 283 A. 2d 392 (1971), where the trial judge employed the cautionary instructions which we believe should have been given here. There, under analogous circumstances, the jury was told:

> " 'Now, the reason that the Court so instructs you is that a person cannot be twice awarded for his loss. Damages cannot be duplicated. The damages in this case, although based on different grounds arose out of an episode that was one continuous occurrence on the date that it happened; that is, the assault and battery, the ar-

rest, the malicious prosecution instituted.' " 263 Md. at 354.

For reasons not relevant here, we were not required to reach the question which confronts us in this case. In our view, this point is controlled by the following principles quoted in 25 C.J.S. *Damages,* § 3:

> "It is generally recognized that there can be only one recovery of damages for one wrong or injury. Double recovery of damages is not permitted; the law does not permit a double satisfaction for a single injury. A plaintiff may not recover damages twice for the same injury simply because he has two legal theories . . . . The overlapping of damages is generally not permissible, and a person is not entitled to recover twice for the same elements of damage growing out of the same occurrence or event . . . ."

We think that in view of the combination of events presented in this case, the trial court erred in not furnishing guidelines to the jury in its consideration of whether to award punitive damages for each of the three torts. The result, as we see it, was that the jury "pyramided" the claims into a triple recovery of punitive damages on the basis "of an episode that was one continuous occurrence."

Because we deal here with error uniquely convertible into monetary terms, we need only make an adjustment, without further proceedings below, which will correctly reflect the verdict of the jury. To that end, we shall modify the judgment so that there may be but one recovery of punitive damages.

> *Judgment modified by reducing amount of punitive damages to $4,500.00; as so modified, judgment affirmed; appellant to pay costs.*