647 A.2d 1218

**MONTGOMERY WARD STORES et al.**

v.

**Frances WILSON.**

**No. 1596, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

Sept. 28, 1994.

John B. Kaiser (McCarthy, Bacon & Costello, on the brief), Lanham, for appellant.

E. Gregory Lardieri, Greenbelt, for appellee.

Argued before ALPERT, GARRITY and FISCHER, JJ.

ALPERT, Judge.

Having been found liable for malicious prosecution and false imprisonment, appellants, Montgomery Ward Stores and Jeffrey Bresnahan, appeal from a judgment entered by the Circuit Court for Prince George's County on a jury verdict in favor of appellee, Frances Wilson, in the amount of $15,000 in compensatory damages and $45,000 in punitive damages. Appellants raise the following issues on appeal:

I. The circuit court erred in failing to grant appellant's motion for judgment.

II. The trial court erroneously instructed the jury and erroneously permitted the jury to consider the issue of punitive damages.

III. The trial court erroneously excluded important evidence critical to appellant's defense.

## Facts and Proceedings

In August 1987, the loss prevention department for the Montgomery Ward store in Temple Hills, Maryland, received complaints from customers regarding unauthorized credit charges on their monthly statements. Appellee was employed as a sales associate with Montgomery Ward from August through October of 1987. On September 4, 1987, she was approached by security guards, who stated that they wanted to interview her. Appellee proceeded upstairs to the office, where she was interviewed by Jeffrey Bresnahan, Montgomery Ward's loss prevention manager. She testified that Mr. Bresnahan asked if she "knew of anybody that's doing any

stealing in the store." He then showed her "a couple of slips that had some signatures on them" and asked her if they were her signatures. Appellee denied ever having seen those credit card slips before. Later that day, appellee overheard Mr. Bresnahan say that she was lying and that he would get a warrant for her arrest.

In October 1987, while appellee was working in the store, a security guard and two Prince George's County Police Officers approached her. She was placed under arrest, handcuffed, and escorted out of the store in front of numerous customers and other employees. Appellee stated that she was "scared, nervous, humiliated, and embarrassed." Eventually, appellee was informed that she had been arrested on charges of credit card theft. The case against her was later "dismissed" in the District Court. As a result of the arrest, appellee lost her position with Montgomery Ward and had difficulty finding other employment. Appellee's mother, Mary Powell, testified that prior to this incident appellee had never been in any trouble with the law. She stated that after the arrest appellee's personality changed and her "nerves got real bad." Appellee's behavior returned to normal within a year, however-er.

Sandra Broadway was employed as a sales associate at Montgomery Ward during August and September of 1987. She and appellee were co-workers. She testified that Mr. Bresnahan interviewed her on September 2, 1987, regarding unauthorized credit card transactions that had been recorded on her cash register. She told him that appellee was the one responsible for making these credit card charges. Ms. Broadway stated that on several occasions appellee gave her slips of paper with account numbers written on them and asked her to charge merchandise to these accounts. According to Ms. Broadway, appellee said that she had permission to use these accounts because they belonged to her cousin or her sister. Ms. Broadway said that she accepted these charges from appellee, although appellee never presented a credit card. At trial, Ms. Broadway admitted that it was a violation of store policy to accept credit card charges without presentation of a

credit card or a driver's license to verify the identity of the person making the charge.

Lisa Holmes was employed as a sales associate at Montgomery Ward in August and September of 1987. She testified that she saw appellee purchase merchandise from Ms. Broadway by giving her a piece of paper with a credit card number on it. She heard appellee say that the charge account belonged to her cousin. Ms. Holmes reported this incident to the loss prevention department when she was interviewed, although she stated that appellee had asked her not to report it.

Mr. Bresnahan testified that on August 26, 1987, he started an investigation into complaints of fraudulent credit card use. Based on his review of the register receipt tapes he determined that these fraudulent charges had all been recorded under Ms. Broadway's identification number. He initially suspected that Ms. Broadway was responsible for the fraudulent charges. When he interviewed Ms. Broadway, however, she told him that she had permitted appellee to make these charges on several occasions because appellee had claimed that she was authorized to use these credit card account numbers. Although Ms. Broadway's acceptance of these charges from appellee without presentation of a credit card or a driver's license was in violation of store policy, Mr. Bresnahan testified that no disciplinary action was taken against Ms. Broadway. He stated that he found "no problem" with the way Ms. Broadway had handled the credit charges at issue here. Rather, his interview with Ms. Broadway led him to investigate appellee as a suspect. He stated that when he interviewed appellee she was not cooperative and that her answers were "limited to one word, yes or no." Mr. Bresnahan then interviewed Ms. Holmes, who stated that she saw appellee charge items by presenting an account number on a piece of paper to Ms. Broadway. Ms. Holmes told Mr. Bresnahan that she heard appellee say that the account belonged to her cousin.

Mr. Bresnahan testified that the merchandise that was fraudulently charged included a full-figured sweater and a maternity bra. There was evidence that appellee is a petite woman who would probably not wear such clothing. No attempt was made to compare appellee's handwriting with any handwriting or signatures on the charge slips. Mr. Bresnahan consulted with the store management and a determination was made to press charges against appellee. No further investigation was undertaken. The application for the statement of charges was submitted to the Commissioner for Prince George's County and a warrant was issued for appellee's arrest. Appellee was arrested and the case was set for trial in the District Court. The charges were subsequently dismissed for reasons that are not apparent in the record. Appellee filed suit for false arrest and malicious prosecution. Appellants' motion for judgment was denied, and the jury verdict, in favor of appellee were entered. This appeal followed.

## I.

### *Malicious Prosecution*

■ Appellants contend that the trial court erred by failing to grant their motion for judgment on the malicious prosecution count. The necessary elements for a claim of malicious prosecution are:

(a) a criminal proceeding instituted or continued by the defendant against the plaintiff,

(b) termination of the proceeding in favor of the accused,

(c) absence of probable cause for the proceeding, and

(d) malice, or a primary purpose in instituting the proceeding other than that of bringing an offender to justice.

*Brewer v. Mele,* 267 Md. 437, 440, 298 A.2d 156 (1972). Appellants argue that appellee failed to establish a legally cognizable claim of malicious prosecution because she did not prove that the criminal proceeding against her was brought without probable cause and with malice. We disagree.

## Probable Cause

In both malicious prosecution and false arrest cases, Maryland courts have frequently addressed the issue of whether probable cause was established as a matter of law or whether a factual dispute warranted submission of the probable cause issue to the jury. Probable cause consists of a reasonable ground of suspicion supported by circumstances strong enough to warrant a cautious person's belief that the accused is guilty. *Palmer Ford, Inc. v. Wood,* 298 Md. 484, 493, 471 A.2d 297 (1984). In determining whether probable cause existed, the focus is on the facts known, or which reasonably should have been known, to the one initiating the criminal proceeding. *Id.* at 495, 471 A.2d 297.

When there are sufficient facts supporting probable cause that are undisputed, probable cause may be decided as a matter of law. *See, e.g., Stansbury v. Luttrell,* 152 Md. 553, 137 A. 339 (1927) (where Luttrell admitted that he directed his servants to cut timber on property that did not belong to him, there was probable cause as a matter of law to prosecute him for theft); *Medcalfe v. Brooklyn Life Ins. Co.,* 45 Md. 198 (1876) (where Medcalfe admitted that he appropriated his principals' funds to his own use, probable cause for embezzlement existed as a matter of law); *Kimbrough v. Giant Food,* 26 Md.App. 640, 339 A.2d 688 (1975) (where Kimbrough, an employee, gave an "incredible" explanation for his conduct in leaving store with groceries that had been mislaid by a customer, probable cause for shoplifting existed as a matter of law).

In *Exxon Corp. v. Kelly,* 281 Md. 689, 381 A.2d 1146 (1978), an Exxon supervisor claimed that he saw Kelly, a mechanic, loading gasoline into the trunk of his car. Kelly was charged with theft. Subsequently, a nolle prosequi was entered and Kelly filed suit for, *inter alia,* false imprisonment and malicious prosecution. The Court of Appeals held that because Kelly categorically denied stealing the gas, the facts relied upon to determine probable cause were in dispute, and the issue of probable cause was a jury question. The court stated,

"[F]urthermore, under conflicting evidence 'the issues as to probable cause and malice, however great the preponderance of probability may [seem] to be on the side of [the] defendant, [are] issues of fact, not law, and under our theory and system of trials their submission to the jury [is] necessary.' " *Id.* at 698, 381 A.2d 1146 (quoting *Veid v. Roberts*, 200 Ala. 576, 76 So. 934, 934 (1917)).

██ Thus, where the parties dispute the facts supporting probable cause, the absence of probable cause is a question for the jury. *See Montgomery Ward & Co. v. Cliser*, 267 Md. 406, 298 A.2d 16 (1972) (where store detective claimed that customer put merchandise in his pocket, but customer denied this, probable cause was a jury issue); *Safeway Stores, Inc. v. Barrack*, 210 Md. 168, 122 A.2d 457 (1956) (where security guard claimed that customer had concealed items, but customer denied this, probable cause was a jury question); *Kennedy v. Crouch*, 191 Md. 580, 62 A.2d 582 (1948) (where Crouch called Kennedy a "screwball," but Crouch contended that he had not made "loud and unseemly noises," probable cause for prosecution on disorderly conduct charge was a jury question); *Glover v. Fleming*, 36 Md.App. 381, 373 A.2d 981, *cert. denied*, 281 Md. 738 (1977) (where initial suspect in theft stated that he had seen Fleming steal the money, but Fleming denied this, probable cause was a jury issue).

██ Additionally, failure to make an adequate investigation of suspicious circumstances may destroy probable cause. *K–Mart Corp. v. Salmon*, 76 Md.App. 568, 579, 547 A.2d 1069 (1988), *cert. denied*, 314 Md. 496, 551 A.2d 867 (1989). This is so because

> the test for probable cause is not limited to actual knowledge of the person initiating criminal proceedings, but rather extends to any knowledge which could or ought to have been gained by a reasonable person. There may be no probable cause where a proper investigation would have cleared away suspicious circumstances.

*Id.* For instance, in *Montgomery Ward & Co. v. Keulemans*, 275 Md. 441, 340 A.2d 705 (1975), a security guard claimed

that he saw Keulemans, an employee, shoplift sunglasses by placing them in his pocket. When he was confronted, Keulemans stated that he had purchased the sunglasses at People's Drug Store. Keulemans was arrested. After his acquittal, he filed suit for, *inter alia,* false arrest, false imprisonment, and malicious prosecution. The Court of Appeals held that probable cause was a jury issue because the security guard in this case should have investigated further, before bringing charges against Keulemans. *Id.* at 448, 340 A.2d 705.

In the case now before us, appellee was implicated solely by the evidence of Ms. Broadway, the initial suspect. While Ms. Holmes stated that she saw appellee charge items and heard appellee say that the credit account belonged to her cousin, we note that this evidence is not necessarily inconsistent with appellee's innocence. Ms. Holmes did not identify the fraudulent credit charges at issue here as having been made by appellee. Additionally, it is clear that Mr. Bresnahan knew that Ms. Broadway had failed to follow store policy by requiring proper identification before accepting the fraudulent charges. There was evidence that the clothing that was charged was not likely to be worn by appellee. Finally, no attempt was made to compare appellee's handwriting to the forged signatures on the credit slips. Given these facts, the jury could have found that further investigation was warranted.[1] Thus, we conclude that there was sufficient evidence of lack of probable cause to warrant submitting this issue to the jury.

**Malice**

In the context of a malicious prosecution case "malice" has been defined as "a primary purpose in instituting the proceeding other than that of bringing an offender to justice."

---

1. The jury was instructed:
 *Failure to conduct an adequate investigation may destroy the* probable cause. It is not just the accuser['\]s limited knowledge, but extent to any knowledge that should or could have been obtained by a reasonable person. So that probable cause does not exist if a proper investigation could have cleared the accused.

*Barrack,* 210 Md. at 173, 122 A.2d 457. Once the jury determined that probable cause was lacking, it was permitted to infer malice. *See, e.g., Banks v. Montgomery Ward & Co.,* 212 Md. 31, 42, 128 A.2d 600 (1957); *Barrack,* 210 Md. at 175, 122 A.2d 457; *Medcalfe,* 45 Md. at 204 ("[m]alice may be inferred from the want of probable cause"). As the Court of Appeals held in *Boyd v. Cross,* 35 Md. 194, 197 (1872):

> Malice is a question of fact for the jury, and its existence may be and most generally is inferred from the want of probable cause for the prosecution, but it does not necessarily follow that because there is an absence of probable cause, the defendant must have been actuated by malice. The presumption of malice, resulting from the want of probable cause is only *prima facie,* and may be rebutted by the circumstances under which the defendant acted.

Thus, as we have held that the issue of probable cause was a jury question, the existence of malice was also properly submitted to the jury. We hold that appellants' motion for judgment as to the malicious prosecution count was properly denied.

**Favorable Termination**

█ Appellants additionally contend that appellee failed to establish the second element under a claim of malicious prosecution; namely, that the criminal proceeding below terminated in her favor. *Brewer,* 267 Md. at 440, 298 A.2d 156. The record reveals, however, that this argument was not presented below in either motion for judgment. It therefore has not been preserved for our review. Md.Rule 8–131(a) (1994).[2]

---

**2.** The jury was instructed on this point, without objection:

Now, what is malicious prosecution? Malicious prosecution is the beginning or continuing of a legal prosecution with malice and without probable cause against another, where the proceedings terminate in favor of the other person. In other words, it's a continuing of a legal proceeding with malice against the other person, where the proceeding terminates or ends in favor of the other person, in this case in favor of Miss Wilson.

■ Even if this issue had been preserved for review, the record does not fully support appellants' contention. At the beginning of the proceeding, appellants sought and were granted a motion in limine to limit testimony suggesting a finding in the District Court of "not guilty." Evidence relating to the favorable termination element, therefore, was restricted to testimony that the charges were "dismissed." An acquittal, dismissal, or abandonment of prosecution, absent evidence suggesting unfavorable circumstances, is sufficient to sustain an action for malicious prosecution. *See Banks v. Montgomery Ward & Co.*, 212 Md. 31, 38, 128 A.2d 600 (1956); *Goldstein v. Rau*, 147 Md. 6, 13, 127 A. 488 (1925). *See also State v. Meade*, 101 Md.App. 512, 529, 647 A.2d 830, 838 (1994). The appellee having established a prima facie case, the burden shifted to appellants to rebut the evidence of favorable termination below. See *Ristaino v. Flannery*, 317 Md. 452, 457–59, 564 A.2d 790 (1989). As the evidence remained uncontradicted, we cannot say the trial judge erred in denying the motion for judgment and submitting the case to the jury.

### *False Arrest/Imprisonment*

■ Appellants next contend that appellee failed to establish a legally cognizable claim of false arrest. "False imprisonment and false arrest are common law torts that apparently differ only in terminology." *Great Atlantic & Pacific Tea Co. v. Paul*, 256 Md. 643, 654, 261 A.2d 731 (1970). Under the common law, the tort of false arrest consisted of an arrest without legal authority. *See Kimbrough v. Giant Food, Inc.*, 26 Md.App. 640, 643, 339 A.2d 688 (1975). Additionally, pursuant to statute, a merchant who causes the arrest of a person may not be held civilly liable for false arrest if, in causing the arrest, the merchant had probable cause to believe that the person had committed the crime of theft. Md.Ann. Code (1989 Repl.Vol.), § 5–307, Cts. & Jud.Proc. Article. Thus, where probable cause is shown, a merchant will not be liable for false arrest. As we have stated, we conclude that the question of the existence of probable cause for appellee's arrest and prosecution was properly submitted to the jury.

Appellants cite *Brewer v. Mele,* 267 Md. 437, 440, 298 A.2d 156 (1972), for the proposition that where an arrest has been effected by valid legal process, an action for false arrest is ordinarily not available. As appellants did not raise this argument below, it is not preserved for our review. Md.Rule 8–131(a) (1994).[3]

## II.

Appellants next contend that the trial court erred in its instructions to the jury on the issue of punitive damages. The court properly instructed the jury that appellee had the burden to show by clear and convincing evidence that she was entitled to punitive damages. Additionally, the court stated that either actual malice or implied malice could support an award of punitive damages in this case.

### Implied Malice

 In defining implied malice, the court said:

The law considers that malice exists in the risk and danger that were known or should have been known at the time. The conduct was performed in such a way to show it was so reckless and so dangerous that it had the disregard for the rights of others, or the conscious disregard for what they did. It is not, I repeat the words, not necessary to show that such conduct was influenced or motivated by hatred.

We conclude that the court correctly instructed the jury that a finding of implied malice could support an award of punitive

---

**3.** The trial judge, in pertinent part, instructed the jury:

So, she's suing Montgomery Ward and Jeffrey Bresnahan for a tort action, an intentional wrong, of false arrest. I'll describe what that is. She's also suing them for something else. Malicious prosecution. She doesn't have to prove both to get damages, but she has to prove one to get the compensatory part of the damages. She has to prove at least one.

No objection was made to this instruction. *But see Caldor v. Bowden,* 330 Md. 632, 662–63, 625 A.2d 959 (1993), where the Court of Appeals held·that "there must be an award of compensatory damages for each count which forms the foundation for an award of punitive damages." *See also Rispoli v. Jackson,* 51 Md.App. 606, 612–13, 445 A.2d 349 (1982).

damages in this case. Appellants cite *Owens–Illinois v. Zeno-bia*, 325 Md. 420, 460, 601 A.2d 633 (1992), for the proposition that punitive damages may not be awarded unless actual malice is shown. *Zenobia* dealt with non-intentional tort actions and, thus, is inapposite. *Id.* at 460 n. 21, 601 A.2d 633. Contrary to appellants' argument, actual malice is not required as a basis for awarding punitive damages in an intentional tort case. Rather, in a malicious prosecution or false arrest case, punitive damages may be recovered where malice may be implied from wantonness or from lack of probable cause. *Montgomery Ward & Co. v. Keulemans*, 275 Md. 441, 448–49, 340 A.2d 705 (1975); *See also Montgomery Ward & Co. v. Cliser*, 267 Md. 406, 421, 298 A.2d 16 (1972) ("[s]ince malice may be implied from want of probable cause ... it would now seem possible to recover punitive damages in a false arrest case without proof of actual malice").[4]

### Ability to Pay Punitive Damages

▮ Appellants argue that because there was no evidence regarding the net worth of Montgomery Ward or Mr. Bresna-

---

**4.** Appellants further assert that appellee argued to the jury that she incurred some lost wages as a consequence of her alleged false arrest and malicious prosecution. Appellants therefore argue that the award of compensatory damages should be vacated because compensation for lost wages is not available in a malicious prosecution case. As this argument was not raised below, however, it is not preserved for our review. Md.Rule 8–131(a) (1994).

Even if this issue were preserved, appellant's argument is unavailing. No authority was cited for this assertion, nor have we found any. To the contrary, one of the most respected treatises, W. Page Keeton et al., *Prosser and Keeton on Torts* § 119 (5th ed. 1984), states that if successful in a malicious prosecution claim, a plaintiff "may recover for any specific financial loss such as loss of present or prospective employment, or loss of business profits which can be proved with reasonable certainty to be caused by the prosecution."

If anything, this court implicitly approved of the element of "lost wages" in *Freeman Ass'n v. Murray*, 18 Md.App. 419, 306 A.2d 548 (1973). In that case, we upheld an award of $15,000 in compensatory damages where "Plaintiff was able to show out-of-pocket expenses of only $250.00 for attorney's fees and a few days of lost wages." *Id.* at 423, 306 A.2d 548.

han, the award of punitive damages was improper. At the close of the evidence, appellant moved for judgment on the issue of punitive damages, contending that the plaintiff was required to introduce evidence of net worth but failed to do so. We agree that, once liability has been established, but not before, evidence of a defendant's ability to pay punitive damages should be considered. *See Fraidin v. Weitzman,* 93 Md.App. 168, 211–17, 611 A.2d 1046 (1992), *cert. denied,* 329 Md. 109, 617 A.2d 1055 (1993).

Appellants apparently would require that evidence of net worth must be introduced before defendant is determined to be responsible for compensatory damages. That cannot be the posture of the law. Indeed, that practice would seem to be precluded by Md.Code C.J. § 10–913(a), which provides:

> In any action for punitive damages for personal injury, evidence of the defendant's financial means is not admissible until there has been *a finding of liability* and that punitive damages are supportable under the facts.

(Emphasis added).

Assuming, *arguendo,* that this type of case may not be considered as one of "personal injury," the logic of the statute is compelling—the wealth or poverty of a defendant could most certainly be an inappropriate influence upon a jury.

We do not suggest "mandatory bifurcation" of compensatory and punitive damage claims. The Court of Appeals spoke to this in *Owens–Illinois, Inc. v. Zenobia,* 325 Md. 420, 601 A.2d 633 (1992):

> Second, amici argue that we should impose mandatory bifurcation of the compensatory and punitive damages claims. We note that a trial court may exercise its discretion and bifurcate these issues, pursuant to Maryland Rule 2–503(b). In addition, as frequently occurs in light of Maryland Code (1974, 1989 Repl.Vol.), § 10–913(a) of the Courts and Judicial Proceedings Article (precluding evidence of a defendant's financial means until there has been a finding that punitive damages are supportable under the facts), the trial court will instruct the jury on the compensa-

tory claims and on the defendant's potential liability for punitive damages. Then, once the jury has made a finding of liability on the underlying claims and has determined that there should be liability for punitive damages, the trial court will further instruct the jury concerning the calculation of a punitive damages award. This is precisely the procedure that was followed in these cases.

If there were two separate damages trials in every case, much of the evidence at the trial solely on the issue of punitive damages would duplicate the evidence admitted at the compensatory damages trial. Many of the same witnesses would have to be recalled to repeat their testimony before the jury. In light of the fact that this duplication would burden both witnesses and jurors as well as waste judicial resources, we believe that mandatory bifurcation is undesirable.

*Id.* at 473–74 n. 29, 601 A.2d 633.

■ We do believe, however, that the general practice is and should be to withhold evidence of ability to pay until and unless the jury awards compensatory damages and decides to award punitive damages. When and if the jury awards compensatory damages, then the trial judge can instruct fully on punitive damages after the presentation of evidence of the defendant's ability to pay. There is but one jury and one trial, although the presentation of financial evidence is delayed until the appropriate time. Thus, the trial truly is not divided into two parts, and witnesses need not be recalled. As to the admission of other evidence that relates to punitive damages, the relevance and admissibility thereof is a matter within the discretion of the trial court to be determined on an *ad hoc* basis.

■ Additionally, appellants argue that the court improperly took judicial notice of Montgomery Ward's status as a major corporation in Maryland. Appellants reason that this had "the practical effect of inviting the jury to feel free to select any figure they capriciously so chose." The court

instructed the jury on punitive damages and stated, among other things:

> There's been no evidence in this case of a financial condition, but I do take judicial notice that Montgomery Ward is a major corporation, and I think you can, as I have, you can do the same.

That instruction may have inappropriately influenced the jurors on the question of liability and would have been equally incorrect if the question of punitive damages had been properly before the jury at that point. There was, however, no objection to that instruction. See Md.Rule 2–520(e).

Earlier in the proceedings, appellant argued its motion for judgment on the issue of punitive damages, contending, at that juncture, that "there's a requirement in Maryland law that the plaintiff, that there be evidence submitted to the fact finder of the financial net worth of the defendant and their ability to pay." The trial judge responded, "I don't think that's necessary when you're dealing with corporations. I can take judicial notice of Montgomery Ward." [5] Appellant's argument, which was not restated as an objection after the jury had been instructed, could not be considered on appeal as an objection to those instructions. See, *e.g., Duvall v. Potomac Electric Power Co.*, 234 Md. 42, 48, 197 A.2d 893 (1964), and *Aetna*

---

5. Md.Rule 5–201 (1994) *Judicial Notice of Adjudicative Facts,* which was not in effect at the time of trial, provides, in relevant part:

> **(b) Kinds of Facts.**—A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.
>
> \* \* \* \* \* \*
>
> **(e) Opportunity to be Heard.**—Upon timely request, a party is entitled to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed. In the absence of prior notification, the request may be made after judicial notice has been taken.
>
> In her commentary on Rule 5–201(b), Professor Lynn McLain observes that "[t]he trial judge's personal knowledge of an adjudicative fact does *not* make it a proper subject of judicial notice." McLain, *Maryland Rules of Evidence* at 82 (1994) (citing *Neal v. Fisher,* 312 Md. 685, 696–97, 541 A.2d 1314, 1320 (1988)) (emphasis in original).

*Casualty & Surety Co. v. Hartford Accident & Indemnity Co.,*
74 Md.App. 539, 549, 539 A.2d 239 (1988).

### III.

Appellants argue that the trial court improperly sustained objections on hearsay grounds that prevented Mr. Bresnahan from testifying with regard to statements made to him by Ms. Broadway and Ms. Holmes. More specifically, on appeal, appellant now asserts:

> Because this case was replete with issues of reasonableness, probable cause and malice, Mr. Bresnahan's testimony regarding what interviews he conducted and how he conducted them were highly relevant. When specifically asked to recount the investigation he prepared and the statements he considered, the trial court sustained a hearsay objection, notwithstanding Appellant's proffer and argument. The trial court precluded Mr. Bresnahan from properly and fully testifying about the investigation.

Although appellant has not directed us to the subject rulings of the court, we believe them to be as follows:

> A. I then asked Miss Broadway how to—how it could be her cousin's. And she went on to explain to me, or made the statement to me—
>
> MR. LARDIERI: Objection.
>
> THE COURT: I'll sustained [sic] that.

> \* \* \* \* \* \*

> Q. Okay.
>
> A. Miss Broadway gave me a written statement on that day.
>
> Q. Okay.
>
> A. Stating—
>
>> MR. LARDIERI: Objection.
>>
>> THE COURT: I'll sustain that objection.

> \* \* \* \* \* \*

Q. Did Miss Broadway confess any guilt to you involving these credit card frauds?

A. No sir, not the guilt. She just stated to me—

MR. LARDIERI: Objection.

THE COURT: You've answered the question.

* * * * * *

I then talked to Miss Broadway again, where she stated to me at that time—

MR. LARDIERI: Objection.

THE COURT: Sustain the objection.

Trial counsel argued to the court:

The issue in this case is the reasonableness and maliciousness of the defendant in this case. The statements he's trying to make are not for the truth of the matter asserted, but for what he did next.

 The court responded by sustaining the objection and instructing trial counsel to rephrase the question. Assuming that the trial judge sustained the objection based on grounds of hearsay, he erred inasmuch as trial counsel explained that the statements to be elicited were not for the purpose of offering the truth of the matters contained therein. There were, however, no specific proffers as to what the statements would reveal. As explained in Joseph F. Murphy, Jr. *Maryland Evidence Handbook* § 101 (2d ed. 1993):

If the trial judge erroneously sustains an objection to your question, you must "proffer" (state for the record) what the answer would be. An offer of proof gives the trial judge a better understanding of the issue triggered by the objection, as well as the opportunity to reconsider a hasty ruling. Its most important function, however, is to preserve the erroneous ruling for appellate review.

*See also* Jacob A. Stein, *Trial Handbook for Maryland Lawyers* § 31.7 (2d ed. 1986). To the extent that the court understood what appellant was trying to prove, and therefore a proffer was unnecessary, *see Jorgensen v. State,* 80 Md.App. 595, 565 A.2d 371 (1989), "[a]ny error of exclusion was cured

by facts established otherwise." *Braxton v. State,* 57 Md.App. 539, 550, 470 A.2d 1327 (1984). As both Ms. Broadway and Ms. Holmes testified regarding their statements, we conclude that any error was harmless and does not merit reversal.[6] If,

---

**6.** With regard to Ms. Broadway (also known as Sandra Fuller), the pertinent part of her testimony follows:

Q. During the course of that interview, did you tell Loss Prevention people that you knew about this incident?
A. Yes.
Q. What did you tell them?
A. I told them that she was, you know, charging up stuff on her cousin's or her sister's account. And she said you couldn't get in trouble for it, because they couldn't prove it was her cousin.
Q. Okay. How many times did you meet with Loss Prevention Specialists regarding this incident?
A. Two or three times.
Q. Okay. And each time that you met with them, did you discuss conversations you had with Miss Wilson?
A. No, I didn't.
Q. Each time you met with them, do you remember when the first time was that you met with the Loss Prevention people?
A. No, I don't.
Q. Do you remember the second time that you met with them, what you told them differently from the first time that you met with them?
MR. LARDIERI: Objection. I think it's leading.
THE COURT: If she remembers. If she doesn't, she doesn't.
THE WITNESS: No. I don't remember exactly.
BY MR. KAISER:
Q. Okay. Do you remember why you met with them on three separate occasions?
A. Yes.
Q. Can you tell us why?
A. They were investigating Miss Wilson and the charge account.
With regard to Ms. Holmes, she testified as follows:
Q. Did there come a time when you were interviewed by the Loss Prevention Department in Montgomery Ward?
A. Yes.
Q. What was that interview about?
A. What all went on.
Q. Excuse me?
A. What all went on.
Q. Who were you interviewed by?
A. I think it was Joe and Calvin. And I think there was somebody else, but I can't remember.
Q. Did you give them a statement?
A. Yes, I did.
Q. What did you tell them?

indeed, appellant was attempting to establish more than that to which Ms. Broadway and Ms. Holmes testified, he did not proffer that to the court and, to that extent, the issue is not preserved for our review.

■ Additionally, the court properly exercised its discretion in refusing to admit a document that appellant had failed to disclose to appellee's counsel during discovery.

■ Finally, appellants contend that the trial judge erred in admitting a certified copy of the docket entries in appellee's criminal case that contained the notation "N.G." Appellants claim that this evidence improperly allowed the jury to believe that appellee was acquitted in the criminal case. We see no merit in this argument, especially considering that appellee testified that the charges against her were "dismissed." [7]

The record reveals that the trial judge also considered the "N.G." notation within the docket entries as merely a "short hand way of disposing of the case." The trial judge, therefore, admitted the document but agreed to "let it come in with some explanation of what N.G. means." On the record it seems that the trial judge later forgot to give this explanatory instruction. Appellants, however, made no further objection to his instructions in that regard.

---

A. I told them that—it's been so long, that I can't remember everything I said. But that she had some merchandise, and she came up to the register with a white piece of paper, and gave it to the cashier, and I can't remember her signing it. I know she had some clothes.

7. That testimony was as follows:
Q. Now, did you go to Court on the criminal charges on the credit card theft? We're in Court now, but did you ever go to Court on the credit card charges?
A. Yes.
Q. And you don't have to tell the whole story, but can you just explain to the jury what the end result was in that case?
A. It was dismissed.
Q. Did any witnesses ever testify against you in the criminal Court?
A. No, they did not.
Q. Was there any trial?
A. No.
Q. Did you ever see Mr. Bresnahan there at the criminal Court?
A. No, he was not.

Appellants further assert that they were improperly denied the opportunity to rebut this evidence. Specifically, appellants claim that during direct examination they were prevented from bringing out testimonial evidence of "why the charges were dropped." Appellants, however, never proffered the anticipated testimony or the facts that would show that the criminal proceeding against appellee did not terminate in her favor. Without the required proffer, this issue is not preserved for our review. *Shpak v. Schertle,* 97 Md.App. 207, 214–16, 629 A.2d 763 (1993).

**JUDGMENTS AFFIRMED; APPELLANTS TO PAY THE COSTS.**