676 A.2d 85

**Henry L. COLE, Jr., et al.**

v.

**David Anthony SULLIVAN.**

**No. 839, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

May 15, 1996.

E. Dale Adkins (Gregory L. VanGeison and Anderson, Coe & King, on brief), Baltimore, for appellants.

Barry C. Steel (Craig D. Spencer, on brief), Towson, for appellees.

Argued before BISHOP, WENNER and MURPHY, JJ.

WENNER, Judge.

The genesis of this appeal is an acrimonious dispute over the disposition of a decedent's estate. Appellants, Henry Cole, Jr. and his wife, Joanne, appeal from the judgment of the Circuit Court for Baltimore County entered in favor of appellees, David A. Sullivan and his wife, Heidi, after a jury awarded the Sullivans damages of $2,822,457.[1] On appeal, we have been presented with four questions which we have reordered and phrased as follows:

 (1) Should the false imprisonment counts have been submitted to the jury?

---

1. Although appellants' brief refers to a judgment of $3,022,457, the actual judgment was for $2,822,457. It appears from appellants' brief that appellants made a $200,000 error in totaling the amount of the judgment. Moreover, the jury returned a special verdict that awarded damages, characterized as either economic or punitive damages, separately for each count.

(2) Did the trial court commit reversible error by introducing testimony of the Coles' financial worth prior to finding the Coles liable?

(3) Did the trial court err by admitting into evidence the taped recording of a message from the Coles' son?

(4) Does Maryland's cap on non-economic damages apply to intentional torts?

For the reasons set forth herein, we shall affirm the judgment of the circuit court.[2]

### Facts

Mrs. Sullivan's father died on 26 April 1992. Within hours of his death, the Coles [3] entered the decedent's home. When the Sullivans inquired what the Coles were doing, the Coles responded "we are in charge now" and ordered the Sullivans off the premises.

Following the decedent's funeral, Mr. Cole informed the Sullivans that he had changed the locks on the decedent's home and said, "I'm controlling it (the house) now." Upon being asked what was motivating his actions, Mr. Cole again ordered the Sullivans off the premises.

Predictably, things got worse. The Coles repeatedly phoned the Sullivans, inquiring about the receipt of mail for the decedent's estate. When Mr. Sullivan asked Mrs. Cole to stop the telephone calls, Mr. Cole responded on an extension line, "Fuck you, you are a dead man."

The Sullivans reported the abusive telephone calls to the Maryland State Police. They also reported a religious statue at their home had been vandalized.

On 12 May 1992, the decedent's will was admitted to probate, and Mrs. Sullivan was qualified as Personal Representative. A short time later, Mr. Cole blocked the decedent's

---

**2.** Trial counsel and appellate counsel were not the same.

**3.** We glean from the record that the Coles are Heidi Sullivan's aunt and uncle.

driveway with a truckload of stone, timber, and severed deer heads.

In addition, Mr. Cole continued the phone calls, repeatedly threatening to kill the Sullivans. On a chance meeting with Mr. Sullivan's mother, Mr. Cole said:

Listen bitch, that mother fucking son is nothing but a piece of shit. That's all he is and I'm going to make that other fucking son of a bitch pay. I'm going to bury him. Do you hear that, bitch? I'm going to bury him. You take that piece of trash bitch and get the fuck out of here. I'm going to bury you all. You better get yourself a good lawyer.

Mr. Cole was eventually arrested for misusing the telephone, released on bail, and ordered to have no further contact with the Sullivans. Unphased, Mr. Cole phoned Mrs. Sullivan at her place of work on three occasions, again threatening her with death.

On 20 May 1992, Mr. Sullivan confronted Mr. Cole at his place of work and asked him to stop the abusive phone calls. Mr. Cole responded, "You are a dead man," and then struck Mr. Sullivan. A tussle ensued, during which Mr. Sullivan struck Mr. Cole "two or three times."

Mr. Cole then ran to his car shouting "your wife's a whore, your wife's a whore." Once at his car, Mr. Cole dialed 911 on his car phone, reporting that Mr. Sullivan had a weapon. Despite the arrival of the police, Mr. Cole threatened "to blow [Mr. Sullivan's] fucking brains out." After the police found no weapons, Mr. Cole was arrested.

Upon being released from custody, Mr. Cole swore out a warrant, charging Mr. Sullivan with assault with intent to murder and various handgun violations. Mr. Sullivan was then arrested, but released on bail.

Unsatisfied, Mr. Cole again swore out a warrant, charging Mr. Sullivan with misusing the telephone and assault and

battery. Consequently, Mr. Sullivan's bail was revoked.[4] Mr. Cole also threatened to kill Mr. Sullivan's mother.

After a jury acquitted Mr. Sullivan of all charges, Mr. Cole phoned Mrs. Sullivan at her place of work, again threatening to kill her. We shall add such other facts as may be necessary for our discussion of the issues presented.

## I.

The Coles first contend that the false imprisonment counts should not have been submitted to the jury. Although this may be true, we agree with the Sullivans that this issue has not been preserved for our review.

In excepting to the trial judge's false imprisonment instructions, the Coles said

[t]he next one would be Plaintiff's proposed jury instruction number fifteen as to the third paragraph where the court instructed the jury false imprisonment does not occur when the information leading to arrest is given in good faith. That is from the *Allen versus Bethlehem Steel Corporation* case. It is my feeling that that only tells half of the story. I also wanted the following part put in, or the law enforcement officer after making an independent investigation concludes that an arrest should be made. So, that was the exception that I would take with reference to that proposed jury instruction.

The trial judge responded

[w]ith regard to the law enforcement officer language after investigation concludes arrest warrant should be issued, there is no evidence whatsoever that the police did that in this case and therefore I think I would be instructing them on something that is not an issue.

The Coles argue that, since Mr. Sullivan was arrested by a police officer executing a facially valid arrest warrant, the jury

---

4. Mr. Sullivan was placed in the Baltimore County Detention Center for 23 days prior to trial.

should. not have been allowed to consider the false imprisonment counts. *Montgomery Ward v. Wilson,* 339 Md. 701, 664 A.2d 916 (1995) ("tort of false imprisonment does not lie ... where the arrest is made by a police officer executing a facially valid arrest warrant."). We find nothing indicating that the trial judge had been made aware of the Coles' position as to Mr. Sullivan's having been arrested by a police officer executing a facially valid warrant.

Md. Rule 2–520(e) provides that "[n]o party may assign as error the giving ... [of] an instruction unless the party objects on the record promptly after the court instructs the jury, *stating distinctly the matter to which the party objects and the grounds of the objection."* (Emphasis added). This affords the trial judge "an opportunity to amend or supplement his charge if he deems an amendment necessary." *Sergeant Co. v. Pickett,* 283 Md. 284, 288, 388 A.2d 543 (1978).

██ We conclude that the trial judge was not afforded an opportunity to consider *Wilson* 's, *supra,* impact on his charge. In sum, the Coles failed to preserve the issue for our review by failing to state distinctly the matter to which they objected and the grounds for the objection. Thus, the issue is not properly before us. *See also, Edmonds. v. Murphy,* 83 Md. App. 133, 177–178, 573 A.2d 853 (1990).

## II.

██ The Coles next contend that evidence of their financial worth should not have been admitted prior to a finding of liability. The Sullivans counter that, because this issue was not raised at trial, it cannot be raised on appeal. We agree.

Nonetheless, the Coles believe the Sullivans had the burden of establishing a prima facie case for punitive damages[5] before inquiring into the Coles' financial worth. As we have said, this issue having been neither raised in nor decided by the trial

---

**5.** Md.Code. Ann. Cts. & Jud. Proc. § 10–913(a); *Montgomery Ward v. Wilson,* 101 Md.App. 535, 550, 647 A.2d 1218 (1994), *rev'd on other grounds,* 339 Md. 701, 664 A.2d 916 (1995).

court, it may not be raised on appeal. Maryland Rule 8–131(a); *Davis v. DiPino*, 337 Md. 642, 647, 655 A.2d 401 (1995).

Although the Coles assert that their failure to comply with the discovery rules was because of the Sullivans wrongfully inquiring into their financial worth, the record reveals that the Coles failed to comply with the discovery rules in any fashion, and did not respond to the Sullivans' Motion for Sanctions. In fact, the Coles only responded when faced with a Show Cause Order.

According to the Coles, the trial court erred in "drastically limit[ing] their evidentiary response to the request for punitive damages." We remind the Coles that "the application of sanctions under the discovery rules is within the sound discretion of the trial judge," *Broadwater v. Arch*, 267 Md. 329, 336, 297 A.2d 671 (1972), and that Rule 2–433 provides that "[u]pon a motion filed under 2–432(a), the court, if it finds a failure of discovery, may enter such orders in regard to the failure as are just, including ... prohibiting that party from introducing designated matters in evidence." There was no error or abuse of discretion.

The Coles also contend that the trial court erred in admitting evidence of their financial worth prior to their being found liable for compensatory damages. This issue has also not been preserved for our review. During the trial, the following colloquy ensued between a witness and counsel for the Coles:

QUESTION: Did Mr. Cole offer an explanation to you why he believed David Sullivan was calling his family and making threats?

ANSWER: Yes. Mr. Cole told me he felt that David Sullivan is also trying to cause trouble because the Cole family is worth 15 to 20 million dollars and he is trying to get a law suit against them.

There was no objection. Rule 2–517 requires an objection to be made at "the time evidence is offered or as

soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived." Although, at a bench conference, counsel for the Coles expressed some concern about the admission of such evidence, "[i]f the trial judge admits the questionable evidence, the party who made the motion [to exclude] ordinarily must object at the time the evidence is actually offered to preserve his objection for appellate review." [6] *Turgut v. Levine*, 79 Md.App. 279, 556 A.2d 720 (1989). While we agree with the Coles that "[i]n any action for punitive damages ..., evidence of the defendant's financial means is not admissible until there has been a finding of liability and that punitive damages are supportable under the facts[,]" they failed to note a timely objection.[7]

### III.

The Coles penultimately contend that the trial court erred in admitting the tape of a message left by their son on the Sullivans' answering machine.[8] The Coles believe its admis-

---

**6.** In *Turgut*, we went on to explain that, while a party who makes a motion to exclude has to object at the time the evidence is actually offered, "when the trial judge resolves these motions by clearly determining that the questionable evidence will *not* be admitted, and by instructing counsel not to proffer the evidence again during trial, the proponent of the evidence is left with nothing to do at trial but follow the court's instructions." 79 Md.App. at 286, 556 A.2d 720. Such is not the case here.

**7.** Even if the Coles had timely objected to the admission of evidence regarding their financial means, we point out that their concerns expressed at the bench conference were over the propriety of allowing the Sullivans to introduce evidence of the Coles' financial worth without giving a concomitant opportunity to rebut. Grounds not specified in an objection are ordinarily waived on appeal. *See U.S. Gypsum Co. v. Mayor and City Council of Baltimore*, 336 Md. 145, 175, 647 A.2d 405 (1994).

**8.** The transcript of the tape is as follows:

Hey, hey, fuck you, you fucking asshole. You're going to get your fucking ass shot, you fucking ugly bitch. I'm going to pull out your fucking eyes and squirrel fuck you, you stupid fucking bitch ... And Dave, fuck you too, you fucking asshole. Bitch, I want to leave another message. Talk about you some fucking more, dickhead.

sion to have been either untimely, or irrelevant. Conversely, the Sullivans contend that the Coles failed to preserve that issue by neglecting to note a timely objection, or, in the alternative, that any error in admitting the evidence was harmless error, in view of the overwhelming evidence against the Coles. We agree with the Sullivans.

When the tape was offered, counsel for the Coles noted an objection, which was overruled after a lengthy bench conference. After counsel returned to the trial tables, the tape was presented and counsel for the Coles failed to renew the objection. Consequently, the Coles' objection was not preserved for our review. *See, Prout v. State,* 311 Md. 348, 535 A.2d 445 (1988).

Although a trial court has wide discretion in admitting or denying the admission of evidence, *Ellsworth v. Sherne Lingerie, Inc.,* 60 Md.App. 104, 481 A.2d 250, rev'd on other grounds, 303 Md. 581, 495 A.2d 348 (1985), we believe the tape was irrelevant, and hence inadmissible. Rule 5–402. The tape simply reveals that the Coles' son is, like his father, disposed to use foul, offensive language and to make threats of violence. In view of the overwhelming evidence against the Coles, however, even had the objection been preserved, its admission constituted harmless error. *Beahm v. Shortall,* 279 Md. 321, 330–31, 368 A.2d 1005 (1977).

## IV.

The Sullivans' award of $2,822,457, included non-economic damages of $1,050,000. The Coles believe that Md. Code

---

Hey, Dave, fucking dickhead. So, what I'm trying to say here is, um, you're a real asshole. Your wife's a cocksucking bitch. Eating fucking Valiums all the time. What the fuck are you doin' huh, asshole shooting heroin in your fucking veins. Look you, fucking dick, we're all gonna shoot your ass. Fucking gays. Blow you're fucking head off, you fucking asshole. Hope you fucking die. Hope your wife has a baby and it dies inside her.

(1974, 1989 Repl.Vol.) § 11–108(b) of the Cts. & Jud. Proc. Article requires that this award be reduced to $350,000.

CJ § 11–108(b) provides:

*Limitation of $350,000 Established.*—(1) In any action for damages for personal injury in which the cause of action arises on or after July 1, 1986, an award for non-economic damages may not exceed $350,000.

The Coles believe the term "personal injury" encompasses intentional torts.[9] Consequently, they believe the cap applies to the Sullivans' award of non-economic damages. We disagree.

 In correctly pointing out that "[i]n construing any statute, one looks first to the words used by the legislature and, if they are clear and unambiguous, gives those words their commonly understood meaning," *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423 (1995), the Coles contend that "personal injury" means:

[i]n a narrow sense, a hurt or damage done to a man's person ... But the term is also used (chiefly in statutes) in a much wider sense, and as including any injury which is an invasion of personal rights, and in this signification, *it may include such injuries to the person as libel or slander, criminal conversation, malicious prosecution, false imprisonment and mental suffering.* (Emphasis added).

Black's Law Dictionary 707 (5th Ed.1979).

Moreover, in determining whether a common carrier's duty to protect its passengers from "personal injury" encompassed false arrest or false imprisonment, the Court of Appeals said:

We can not [sic] adopt this contention of the defendant that no personal injury has been done or personal assault has been offered the plaintiff by his false arrest and imprison-

---

9. Tracing the history of 1798 Md. Laws 101, Ch. 8, § 5, a statute "to assist Marylanders aggrieved by wrongs imposed on them during the Civil War," the Coles contend that the legislature purposely used the term "personal injury" to include those injuries associated with intentional torts. The cases cited by the Coles are in no manner analogous to the case at hand.

ment. Not only was it a personal indignity and insult, but a personal injury, as well. 'A personal injury includes libel, slander, criminal conversation, seduction and malicious prosecution; also an assault, battery, false imprisonment or other actionable injury to the person.'

*New York, Phila., & Norfolk R.R. Co. v. Waldron,* 116 Md. 441, 445, 82 A. 709 (1911) (citations omitted).

 We point out, however, that, although we must consider the literal or usual meaning of the words of the statute, we must also consider "their meaning and effect in light of the setting, objectives and purpose of the enactment." *Prince George's County v. Brown,* 334 Md. 650, 659, 640 A.2d 1142 (1993). Keeping in mind that "the meaning of words varies according to the circumstances of and concerning which they are used," *Smith v. Pyles, Inc.,* 20 Md.App. 478, 481, 316 A.2d 326 (1974), we now turn to whether § 11–108 applies to awards stemming from the commission of intentional torts.

Although this appears to be an issue of first impression, we believe the Court of Appeals and the Maryland General Assembly have provided us with ample guidance.

Answering a question certified to it by the United States District Court for the District of Maryland, the Court of Appeals said:

> In light of the language of the statute and its context, the extensive legislative history, and the practical and unresolved difficulties of applying the cap statute to reduce an award of damages in a wrongful death action, we conclude that the cap statute was not intended to apply to reduce an award for damages in a wrongful death action.

*United States v. Streidel,* 329 Md. 533, 539, 620 A.2d 905 (1993).

Although the General Assembly abrogated the holding in *Streidel* by enacting legislation applying the cap to actions for

wrongful death filed after 1 October 1994,[10] we find the reasons advanced by the *Streidel* Court for not applying the cap to such actions to be helpful. Moreover, we believe the intent of the legislature in amending § 11–108 was to abate the continuing escalation of liability insurance premiums.[11]

The Court of Appeals pointed out in *Streidel* that "[t]he term 'personal injury' or 'injury' normally connotes a physical injury to a victim" and also noted that wrongful death actions are designed to "compensate the party entitled to damages ... for the loss of the deceased." *Streidel,* 329 Md. at 542–544, 620 A.2d 905. Non-economic damages "that are the subject of the cap" such as "pain, suffering, inconvenience, physical impairment, disfigurement, loss of consortium, or other nonpecuniary injur[ies]"[12] are in some instances "not recoverable in a wrongful death action," *id.* at 544, 620 A.2d 905, and are not ordinarily recoverable in actions for intentional torts.[13]

Although we acknowledge that bodily injuries often arise from intentional torts,[14] we are convinced that § 11–108 was enacted simply to

---

10. Judgments—Limitations on Noneconomic Damages Act, ch. 477, 1994 Md. Laws 2292 (codified as amended at Md. Code Ann., Cts. & Jud. Proc. §§ 11–108, 11–109 (1995)).

11. The Bill nullifying *Streidel* was assigned to the Senate Judicial Proceedings Committee, chaired by its sponsor, Senator Walter Baker (D–Cecil). Senator Baker was of the view, as were many of his colleagues, that § 11–108 applied to wrongful death actions. This belief reflected a fear that the cost of medical malpractice insurance, presumably stabilized by § 11–108, would continue to escalate if wrongful death awards were not restrained by the cap. Diana M. Schobel, Recent Development, 54 Md. L.Rev. 914, 916 (1995) (citations omitted).

12. See Md. Code. Ann. Courts and Judicial Proceedings § 11–108(a)(1).

13. Inconvenience, physical impairment, disfigurement, and loss of consortium, are not recoverable in a wrongful death action. *Streidel* at 544, 620 A.2d 905 (citations omitted).

14. For example, a simple assault and battery may or may not result in physical harm. A slap may produce no appreciable physical harm; a

assure the availability of sufficient liability insurance, at a reasonable cost, in order to cover claims for personal injuries to members of the public. * * * A cap on noneconomic damages may lead to greater ease in calculating premiums, thus making the market more attractive to insurers, and ultimately may lead to reduced premiums, making insurance more affordable for individuals and organizations performing needed services.

*Murphy v. Edmonds,* 325 Md. 342, 369, 601 A.2d 102 (1992).

Moreover, the Court noted in *Streidel* that § 11–108 was adopted " 'in response to a legislatively perceived crises concerning the availability and cost of liability insurance in this State,' " 329 Md. at 549, 620 A.2d 905 (quoting, *Murphy, supra*), and went on to say:

In the final version of the bill [which in part eventually became § 11–108], the scope of the cap's application was narrower than in the version originally introduced, although broader than in the version as amended by the Senate. *The actions subject to the cap were narrowed from tort claims to personal injury claims, but these personal injury claims included injuries other than those caused by medical malpractice.*

*Id.* (emphasis added).

It is, of course, arguable that both intentional and nonintentional torts affect liability insurance rates, or that the term "personal injury" means more than physical injury to the person. Nonetheless, we believe that intentional torts are generally excluded from coverage. Therefore, applying the cap to intentional torts would not materially affect the cost of liability insurance. *See e.g. Aetna Cas. & Sur. Co. v. Cochran,* 337 Md. 98, 651 A.2d 859 (1995) (intentional act exclusionary clause litigation); *Chesapeake Physicians v. Home Ins. Co.,* 92 Md.App. 385, 608 A.2d 822 (1991) (intentional act exclusionary clause litigation); *see also,* James L. Rigelhaupt, Jr., Con-

---

stabbing or gunshot, assuming the victim survives, may result in extraordinary bodily injury.

STRUCTION AND APPLICATION OR PROVISIONS OF LIABILITY INSURANCE POLICY EXPRESSLY EXCLUDING INJURIES INTENDED OR EXPECTED BY INSURED, 31 A.L.R.4th 957 (1995) (and cases therein cited); 7A Appleman, INSURANCE LAW AND PRACTICE § 4501.09 at 265 (1979) (Liability insurance does not generally cover intentional injuries. Otherwise such insurance could be used as a license to wreak havoc.). There are a plethora of cases in this and in other jurisdictions dealing with clauses in insurance policies excluding intentional misconduct. While we do not believe this exclusion of intentional misconduct from insurance coverage alone to be dispositive, the conspicuous absence of any discussion in § 11–108's legislative history of its application to intentional injuries convinces us that § 11–108 does not apply to intentional torts, whether or not personal bodily injuries are involved. Although we are mindful of the inherent inconsistency of permitting recovery for some tort victims while denying it to others,[15] we may not substitute our judgment for that of the Court of Appeals, or of the General Assembly. 329 Md. at 550, 620 A.2d 905 (citing *Birmingham v. Board of Public Works*, 249 Md. 443, 449–50, 239 A.2d 923 (1968)).

As we have said, § 11–108 was enacted and amended to stabilize the spiraling cost of liability insurance. We glean no legislative intent to protect individuals from the economic consequences of intentional misconduct. In sum, § 11–108's cap does not apply to intentional torts.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**

---

15. *See generally, United States v. Streidel*, 329 Md. 533, 554, 620 A.2d 905 (1993) (J. Chasanow, concurring).